JS 44C/SDNY
REV. 7/2012

CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States In September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

**PLAINTIFFS**
STEVEN L. SHAPIRO, as Custodian for STACY SHAPIRO UGMA and MARCI SHAPIRO UGMA

**DEFENDANTS**
BANK OF AMERICA CORPORATION and MERRILL LYNCH & CO.

ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Alan L. Frank, Esquire
135 Old York Road
Jenkintown, PA 19046   T: 215.935.1000

ATTORNEYS (IF KNOWN)

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Securities Fraud, negligence, intentional misrepresentation

Has this or a similar case been previously filed in SDNY at any time? No [ ]   Yes [X]   Judge Previously Assigned

If yes, was this case  Vol. [ ]  Invol. [ ]   Dismissed.  No [X] Yes [ ]   If yes, give date _____ & Case No. _____

IS THIS AN INTERNATIONAL ARBITRATION CASE?   No [X]   Yes [ ]

*(PLACE AN [x] IN ONE BOX ONLY)*          NATURE OF SUIT

TORTS                                      ACTIONS UNDER STATUTES

| CONTRACT | PERSONAL INJURY | PERSONAL INJURY | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110  INSURANCE | [ ] 310  AIRPLANE | [ ] 362  PERSONAL INJURY - MED MALPRACTICE | [ ] 610  AGRICULTURE | [ ] 422  APPEAL 28 USC 158 | [ ] 400  STATE REAPPORTIONMENT |
| [ ] 120  MARINE | [ ] 315  AIRPLANE PRODUCT LIABILITY | [ ] 365  PERSONAL INJURY PRODUCT LIABILITY | [ ] 620  OTHER FOOD & DRUG | [ ] 423  WITHDRAWAL 28 USC 157 | [ ] 410  ANTITRUST |
| [ ] 130  MILLER ACT | [ ] 320  ASSAULT, LIBEL & SLANDER | [ ] 368  ASBESTOS PERSONAL INJURY PRODUCT LIABILITY | [ ] 625  DRUG RELATED SEIZURE OF PROPERTY 21 USC 881 | | [ ] 430  BANKS & BANKING |
| [ ] 140  NEGOTIABLE INSTRUMENT | [ ] 330  FEDERAL EMPLOYERS' LIABILITY | | | PROPERTY RIGHTS | [ ] 450  COMMERCE |
| [ ] 150  RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT | [ ] 340  MARINE | PERSONAL PROPERTY | [ ] 630  LIQUOR LAWS | | [ ] 460  DEPORTATION |
| | [ ] 345  MARINE PRODUCT LIABILITY | [ ] 370  OTHER FRAUD | [ ] 640  RR & TRUCK | [ ] 820  COPYRIGHTS | [ ] 470  RACKETEER INFLU- ENCED & CORRUPT ORGANIZATION ACT (RICO) |
| [ ] 151  MEDICARE ACT | | [ ] 371  TRUTH IN LENDING | [ ] 650  AIRLINE REGS | [ ] 830  PATENT | |
| [ ] 152  RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS) | [ ] 350  MOTOR VEHICLE | [ ] 380  OTHER PERSONAL PROPERTY DAMAGE | [ ] 660  OCCUPATIONAL SAFETY/HEALTH | [ ] 840  TRADEMARK | [ ] 480  CONSUMER CREDIT |
| | [ ] 355  MOTOR VEHICLE PRODUCT LIABILITY | [ ] 385  PROPERTY DAMAGE PRODUCT LIABILITY | [ ] 690  OTHER | | [ ] 490  CABLE/SATELLITE TV |
| [ ] 153  RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS | [ ] 360  OTHER PERSONAL INJURY | | | SOCIAL SECURITY | [ ] 810  SELECTIVE SERVICE |
| | | | LABOR | [ ] 861  HIA (1395ff) | [X] 850  SECURITIES/ COMMODITIES/ EXCHANGE |
| [ ] 160  STOCKHOLDERS SUITS | | | [ ] 710  FAIR LABOR STANDARDS ACT | [ ] 862  BLACK LUNG (923) | [ ] 875  CUSTOMER CHALLENGE 12 USC 3410 |
| [ ] 190  OTHER CONTRACT | | PRISONER PETITIONS | [ ] 720  LABOR/MGMT RELATIONS | [ ] 863  DIWC/DIWW (405(g)) | |
| [ ] 195  CONTRACT PRODUCT LIABILITY | | [ ] 510  MOTIONS TO VACATE SENTENCE 20 USC 2255 | [ ] 730  LABOR/MGMT REPORTING & DISCLOSURE ACT | [ ] 864  SSID TITLE XVI | [ ] 890  OTHER STATUTORY ACTIONS |
| | ACTIONS UNDER STATUTES | [ ] 530  HABEAS CORPUS | [ ] 740  RAILWAY LABOR ACT | [ ] 865  RSI (405(g)) | [ ] 891  AGRICULTURAL ACTS |
| [ ] 196  FRANCHISE | CIVIL RIGHTS | [ ] 535  DEATH PENALTY | [ ] 790  OTHER LABOR LITIGATION | FEDERAL TAX SUITS | [ ] 892  ECONOMIC STABILIZATION ACT |
| | [ ] 441  VOTING | [ ] 540  MANDAMUS & OTHER | [ ] 791  EMPL RET INC SECURITY ACT | [ ] 870  TAXES (U.S. Plaintiff or Defendant) | [ ] 893  ENVIRONMENTAL MATTERS |
| REAL PROPERTY | [ ] 442  EMPLOYMENT | | | [ ] 871  IRS-THIRD PARTY 26 USC 7609 | [ ] 894  ENERGY ALLOCATION ACT |
| | [ ] 443  HOUSING/ ACCOMMODATIONS | | IMMIGRATION | | [ ] 895  FREEDOM OF INFORMATION ACT |
| [ ] 210  LAND CONDEMNATION | [ ] 444  WELFARE | PRISONER CIVIL RIGHTS | [ ] 462  NATURALIZATION APPLICATION | | [ ] 900  APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE |
| [ ] 220  FORECLOSURE | [ ] 445  AMERICANS WITH DISABILITIES - EMPLOYMENT | [ ] 550  CIVIL RIGHTS | [ ] 463  HABEAS CORPUS- ALIEN DETAINEE | | [ ] 950  CONSTITUTIONALITY OF STATE STATUTES |
| [ ] 230  RENT LEASE & EJECTMENT | [ ] 448  AMERICANS WITH DISABILITIES -OTHER | [ ] 555  PRISON CONDITION | [ ] 465  OTHER IMMIGRATION ACTIONS | | |
| [ ] 240  TORTS TO LAND | [ ] 440  OTHER CIVIL RIGHTS (Non-Prisoner) | | | | |
| [ ] 245  TORT PRODUCT LIABILITY | | | | | |
| [ ] 290  ALL OTHER REAL PROPERTY | | | | | |

*Check if demanded in complaint:*

CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.? IF SO, STATE:

DEMAND $_____ OTHER _____   JUDGE P. Kevin Castel   DOCKET NUMBER 1:09-md-02058-PKC

*Check YES only if demanded in complaint*
JURY DEMAND: [X] YES [ ] NO

NOTE:  Please submit at the time of filing an explanation of why cases are deemed related.

Plaintiff herein opted out of pending Class Action

(PLACE AN x IN ONE BOX ONLY)                                    **ORIGIN**

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ a. all parties represented ☐ b. At least one party is pro se. ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from (Specify District) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judge Judgment

(PLACE AN x IN ONE BOX ONLY)                    **BASIS OF JURISDICTION**                                  *IF DIVERSITY, INDICATE CITIZENSHIP BELOW. (28 USC 1332, 1441)*

☐ 1 U.S. PLAINTIFF    ☐ 2 U.S. DEFENDANT    ☒ 3 FEDERAL QUESTION (U.S. NOT A PARTY)    ☐ 4 DIVERSITY

CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF | DEF |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

STEVEN L. SHAPIRO, as Custodian for Stacy Shapiro UGMA amd Marci Shapiro UGMA
900 North Kings Highway
Cherry Hill, NJ 08034

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

BANK OF AMERICA CORPORATION
100 N. Tryon Street                    and
Charlotte, NC 28255

MERRILL LYNCH & CO.
4 World Financial Center
New York, NY 10080

DEFENDANT(S) ADDRESS UNKNOWN
    REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE
RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:     THIS ACTION SHOULD BE ASSIGNED TO:    ☐ WHITE PLAINS    ☑ MANHATTAN
               (DO NOT check either box if this a PRISONER PETITION/PRISONER CIVIL RIGHTS COMPLAINT.)

DATE 9/7/12    SIGNATURE OF ATTORNEY OF RECORD

RECEIPT #

ADMITTED TO PRACTICE IN THIS DISTRICT
[ ] NO
[X] YES (DATE ADMITTED Mo. _____ Yr. _____)
Attorney Bar Code # 4211744

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

# 12 CIV 6864

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| STEVEN L. SHAPIRO, as Custodian for STACY SHAPIRO UGMA and MARCI SHAPIRO UGMA 900 North Kings Highway Cherry Hill, NJ 08034 | : : : : : |
| Plaintiffs, | : : |
| v. | : : |
| BANK OF AMERICA CORPORATION, 100 N Tryon Street Charlotte, NC 28255 | : : : : |
| and | : : |
| MERRILL LYNCH & CO., 4 World Financial Center New York, NY 10080 | : : : : : |
| Defendants. | : : |

Civil Action

Case No.

12-MEMBER JURY TRIAL DEMANDED

SEP 1 1 2012
U.S.D.C. S.D. N.Y.
CASHIERS

## PARTIES

1.    Steven L. Shapiro is the custodian for Stacy Shapiro UGMA and Marci Shapiro UGMA,

previously class members in the class action, *In re Bank of America Corp., Securities, Derivative,*

*and Employment Retirement Income Security Act (ERISA) Litigation*, Master File No. 09 MDL

2058 (DC), in the United States District Court for the Southern District of New York. (A copy of

the Plaintiffs' Second Consolidated Amended Complaint is attached hereto and incorporated

herein as "Exhibit A.") Steven L. Shapiro in his capacity as custodian, Stacy Shapiro UGMA,

and Marci Shapiro UGMA, opted out of the class action by way of a May 4, 2012 letter.   (A

copy of the May 4, 2012 letter is attached hereto and incorporated herein as "Exhibit B.")

2.    Stacy Shapiro UGMA owned 2,400 shares of Bank of America common stock, which

were acquired prior to the class action period. 2,000 shares were sold on October 8, 2008, at a price of $22.06 per share. The remaining 400 shares were not sold or otherwise disposed of during the relevant periods.

3.     Marci Shapiro UGMA owned 500 shares of Bank of America common stock, which were acquired prior to the relevant periods and not sold or otherwise disposed of during the relevant periods.

4.     Steven L. Shapiro in his capacity as custodian, Stacy Shapiro UGMA, and Marci Shapiro UGMA, are collectively referred to herein as "Plaintiffs."

5.     Allegations herein concerning Plaintiffs' own conduct are based upon personal knowledge. Allegations concerning Defendants are based upon information and belief, based in part upon the due diligence of Plaintiffs' former class action counsel. These allegations are further based in part on the allegations of plaintiffs in the above-referenced class action.

6.     Defendant Bank of America Corporation ("BoA") is a Delaware corporation headquartered at 100 N Tryon Street, Charlotte, NC 28255. BoA is one of the Country's largest financial institutions, providing a range of banking and non-banking financial services and products domestically and internationally. BoA securities actively trade on the NYSE under the ticker symbol BAC and, as of April 30, 2009, there were 6,402,966,457 shares of its common stock outstanding. On or about October 7, 2008, BoA issued 455,000,000 shares of BoA common stock, with an underwriter option to issue an additional 68,250,000 shares of common stock, in the Secondary Offering. The Secondary Offering was conducted pursuant to BoA's Shelf Registration Statement dated May 5, 2006 and filed with the SEC on Form S-3ASR (the "Secondary Offering Registration Statement"), and a Prospectus Supplement filed with the SEC

2

on October 9, 2008 on Form 424(b)(5) (the "Prospectus Supplement") (collectively, the "Offering Documents").

7.      Defendant Merrill Lynch & Co. ("Merrill") is a Delaware corporation with a principal place of business at 4 World Financial Center, New York, NY 10080.  Merrill is a global financial services company, providing investment banking, wealth management, and research services.  Merrill stock was actively traded on the NYSE under the ticker symbol MER.  As of January 1, 2009, Merrill became a direct subsidiary of BoA.

## JURISDICTION AND VENUE

8.      Counts I, II, III, and IV asserted herein arise under (i) Sections 10(b) and 14(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78n(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9 ("Rule 14a-9"); and (ii) Sections 11 and 12 of the Securities Act, 15 U.S.C. §§ 77k and 77l.

9.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.  This Court has jurisdiction over Plaintiffs' claims under New Jersey law because they arise from the same set of operative facts.

10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 22(a) of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b), (c), and (d). Many of the acts and transactions that form the basis of Plaintiff's claims occurred in this District.

3

## FACTS COMMON TO ALL COUNTS

11.     This action involves a series of materially false and misleading statements and omissions by Defendants in connection with BoA's $50 billion acquisition of Merrill Lynch, which was announced on September 15, 2008, voted on by BoA's shareholders on December 5, 2008, and consummated on January 1, 2009.

12.     BoA had agreed to acquire Merrill in one of the largest mergers in Wall Street history. Pursuant to the terms of the Merger Agreement, BoA agreed to pay $29 per share in stock to acquire Merrill - a total of $50 billion - a price that represented a substantial 70% premium over the price at which Merrill stock closed on September 12.

13.     During the abbreviated merger negotiations, BoA and Merrill spent considerable time negotiating the discretionary year-end bonuses that Merrill executives and employees would receive for 2008. Ultimately BoA agreed to allow Merrill to pay up to $5.8 billion in discretionary year-end bonuses - an amount which represented 12% of the merger price, and more than 75% of the "record" $7.5 billion profit Merrill had reported in 2006 (the last year it would ever report a profit.) BoA, also agreed to allow Merrill to accelerate payment of these bonuses so that Merrill could pay them in December 2008, before the merger closed, rather than in January, when bonuses were supposed to be paid at Merrill, to ensure that Merrill would be able to exercise significant control over the bonus amounts and the recipients of the bonuses.

14.     Throughout October and November 2008 - the two months immediately preceding the December 5, 2008 shareholder vote on the merger - Merrill and BoA suffered highly material undisclosed losses that greatly jeopardized the solvency of Merrill and the combined company. In October 2008 alone, Merrill lost a staggering $7 billion. In November 2008, Merrill lost an

4

additional $6.3 billion, and also suffered a good will impairment of another $2 billion in connection with the failure of its wholly-owned subprime residential mortgage lender. Thus, by the date of the merger vote, <u>Merrill had lost at least $15.3 billion in just two months</u> - and Merrill was internally projecting billions of dollars of additional losses in December. The losses were large enough to bankrupt Merrill, and in the weeks preceding the shareholder vote, senior BoA executives repeatedly discussed terminating the merger by invoking the "material adverse effect" clause in the merger agreement (commonly known as a "material adverse change" clause or "MAC").

15.     Notwithstanding these highly material facts, neither Merrill nor BoA disclosed any information relating to Merrill's enormous pre-merger losses, of the fact that BoA had agreed to allow Merrill to pay billions in bonuses regardless of those losses, prior to the shareholder vote. Instead, on November 3, 2008, BoA and Merrill filed with the SEC a Joint Definitive Proxy Statement soliciting approval of the merger from the shareholders of both companies, which materially misstated Merrill's financial condition and the strength of the combined company, and failed to disclose the agreement allowing Merrill to pay billions of dollars of bonuses before the merger closed (as defined further below, the "Proxy"). Indeed, the Proxy specifically highlighted the purported "strong capital position" of the combined company, and falsely represented that there has been no "material adverse changes" to Merrill's financial condition. Further, rather than disclosing the fact that BoA had already agreed to allow Merrill to pay up to $5.8 billion in bonuses, the Proxy represented that Merrill had agreed <u>not</u> to pay year-end performance bonuses or other discretionary incentive compensation prior to the closing of the merger without BoA's consent.

5

16.     Documents, sworn testimony, and acknowledgments by Defendants cited herein establish that both Merrill and BoA senior executives were fully aware of both BoA's agreement to allow Merrill to pay the bonuses and the massive losses Merrill was experiencing. Executives at BoA expressly approved the Merrill bonuses, and were kept fully informed about Merrill's deteriorating financial condition from the time the merger was announced.

17.     On December 5, 2008, shareholders of BoA, oblivious to the fact that Merrill has lost at least $15.3 billion in the first two months of the fourth quarter, and that BoA and Merrill had agreed to pay billions of dollars in bonuses to Merrill's executives notwithstanding these crippling losses, approved the merger. The closing date was set for January 1, 2009.

18.     Following the shareholder vote, Defendants continued to conceal highly material information from investors.

19.     The merger closed on January 1, 2009, with BoA shareholders and investors still unaware that (i) Merrill had lost more that $21 billion in the fourth quarter of 2008; (ii) as a result of these massive losses, BoA had determined that a MAC had occurred and that BoA should nor proceed with the merger; (iii) BoA could not absorb Merrill's losses without receiving a $138 billion taxpayer bailout; and (iv) notwithstanding Merrill's losses, Merrill had paid its executives and employees $3.6 billion in bonuses prior to the close of the merger, further, depleting Merrill's resources. Instead, BoA issued a press release that day falsely claiming that the merger "creat[ed] a premier financial services franchise."

20.     News about these materially adverse facts did not begin to enter the market until mid-January 2009. On the morning of January 19, 2009, a Citigroup analyst wrote, based on information leaked to the market, that BoA might post a $3.6 billion fourth-quarter loss and slash

its quarterly dividend from $0.32 to $0.05 per share. On January 15, 2009 *The Wall Street Journal* reported that BoA was "to get billions in U.S. aid . . . because of Merrill's larger-than-expected losses in the fourth quarter." In response, BoA moved its earnings conference call from January 20 to January 16, 2009. On January 16, BoA announced that Merrill had suffered more than $21 billion of losses during the fourth quarter, and that BoA had suffered an additional $1.8 billion loss. BoA also announced that the U.S. Government was extending a $138 billion taxpayer bailout to BoA, and that the Company was slashing its dividend from $0.32 to $0.01 per share to preserve capital.

21. The news stunned the investment community. J.P. Morgan analysts reported that Merrill's losses were "enormous" and "much worse" than expected, and *The New York Times* reported that Merrill's losses were "devastating." After the close of the market, it was reported that Moody's Corp. ("Moody's") had downgraded BoA's credit ratings due to "the disclosure of substantial losses at Merrill Lynch," and Fitch Ratings, Inc. ("Fitch") had downgraded Merrill's individual rating to "F" - well below junk status - due to its "massive losses" and its inability to "survive ... absent assistance provided by the US Treasury."

22. In direct response to these disclosures, BoA shares lost more than half of their value, falling from $12.99 on January 9 (the trading day immediately prior to the January 12 disclosure) to $5.10 on January 20 - a market capitalization loss of approximately $50 billion. *The New York Times* described the loss as "one of the greatest destructions of shareholder value in financial history." Yet, these shares were still inflated, as BoA continued to conceal the materially adverse fact that, despite Merrill's gargantuan losses, BoA had allowed Merrill to pay billions of dollars in bonuses to its executives and employees before the merger closed.

7

23.     On the night of January 21, 2009, the *Financial Times* reported that, in late December, immediately prior to the closing date, Merrill has paid $3-4 billion in bonuses despite its massive fourth quarter losses.

24.     The events surrounding the Merrill acquisition have continued to have a substantial negative effect on the Company. In late January 2009, the New York Attorney General, Andrew M. Cuomo, initiated an investigation into Merrill's accelerated bonus payments. On September 8, 2009, the New York Attorney General's office released a letter in which it stated that its ongoing investigation had "found at least four instances in the fourth quarter of 2008 where Bank of America and its senior officers failed to disclose material non-public information to its shareholders" - including Merrill's losses, the accelerated bonus payments, undisclosed good will write-downs, and the decision to invoke the MAC - and that "the fact of Bank of America's senior executives' knowledge of these events are straightforward." In April 2009, BoA shareholders - expressing their fury over CEO Ken Lewis's ("Lewis") conduct in connection with the merger - voted to strip Lewis of his position as Chairman of the BoA Board. *BusinessWeek* reported that the "vote marked the first time that a company in the Standard & Poor's 500-stock index had been forced by shareholders to strip a CEO of chairman duties." Ten members of the BoA Board have resigned since the merger closed. In May 2009, Congress initiated an investigation into the circumstances surrounding the merger, including BoA's refusal to disclose Merrill's losses, and has to date held hearings during which Lewis, Secretary Paulson, and Chairman Bernanke have testified.

25.     In August 2009, the SEC sued BoA for violating Section 14(a) and Rule 14a-9 of the Securities Exchange Act of 1934 (the "Exchange Act"), alleging the "Bank of America's failure

8

to disclose the fact that it has agreed to allow Merrill to pay up to $5.8 billion in discretionary bonuses before the merger closed" violated the federal securities law because "this omission made statements in Bank of America's proxy materials materially false and misleading." On the same day that the SEC filed its complaint, it announced that BoA had agreed to settle the action and pay a $33 million fine. On September 14, 2009, the United States District Court for the Southern District of New York rejected that settlement , holding that, given the strength of the allegations and the fact that no individual was either named as a defendant or contributing to the settlement, the proposed settlement as "neither fair, nor reasonable, nor adequate."

26.     On September 19, 2009, the *Charlotte Observer* reported that, for the past six months, the F.B.I. and the U.S. Department of Justice had been conducting an extensive "criminal investigation" of BoA in connection with the merger, during which the agencies had interviewed numerous executives and reviewed hundreds of thousands of documents.

27.     Based on the facts alleged herein, Plaintiffs assert claims against BoA and Merrill under (i) Section 10(b) of the Exchange Act; (ii) Section 14(a) of the Exchange Act; (iii) Section 11 of the Securities Act of 1933 (the "Securities Act"); (iv) Section 12(a)(2) of the Securities Act; and (v) New Jersey statutory and common law.

28.     As *The Wall Street Journal* reported on September 15, 2008, Ken Lewis had "long coveted" Merrill. Indeed, Merrill, a 94-year old pillar of Wall Street, possessed significant prestige and respect for which Lewis and the Charlotte-based BoA has "long clamored," and its acquisition was "the final piece" of Lewis's plan to make BoA the country's biggest bank by assets and arguably its most powerful financial institution, as Lewis himself acknowledged during and October 19, 2008 interview on *60 Minutes:*

9

| Question: | You always wanted Merrill Lynch |
|---|---|
| Lewis: | We've always thought what was the best fit for us. |
| Question: | You were drooling for Merrill Lynch. |
| Lewis: | We have always thought it was . . . Yep. |

29.     As the financial market collapsed in 2008, Lewis got the chance to acquire the company

he coveted. On Sunday, September 7, 2008, the U.S. Government seized the country's two

largest mortgage companies, known as Fannie Mae and Freddie Mac, placed them into

conservatorships, and agreed to inject as much as $100 billion into each institution to remedy its

capital shortfall. Days later, on September 11, 2008, American International Group, Inc. ("AIG")

saw its stock price plummet 31% in the face of looming rating agency downgrades and resulting

collateral calls, and immediately began negotiating a deal to, in effect, sell itself to the U.S.

Government for $85 billion to avert imminent bankruptcy.

30.     The next day, Friday, September 12, 2008, it became clear that Lehman, one of Wall

Street's most venerable institutions, would have to find a buyer or be forced to file for

bankruptcy by September 15. Lehman's bankruptcy - the largest in U.S. history - was certain to

further destabilize the financial markets by causing lenders to halt crucial daily funding to other

financial companies with large exposure to similar mortgage-linked assets, leaving those

companies vulnerable to collapse.

31.     As Merrill CEO John Thain ("Thain") realized, Lehman's bankruptcy would almost

certainly trigger Merrill's own collapse. Indeed, in a February 19, 2009 deposition taken by the

New York Attorney General's office, Thain testified that he knew that Lehman's failure would

likely render Merrill effectively insolvent "beginning Monday morning," September 15, 2008.

As Thain stated in a speech he delivered at the Wharton School of the University of Pennsylvania

10

on September 17, 2009, given the "amount of bad assets on [Merrill's] balance sheet," Lehman's bankruptcy would be "catastrophic" for Merrill. Accordingly, Thain immediately began searching for a buyer for Merrill.

32.    As Thain later stated, he knew that Lewis "always wanted" to acquire Merrill. Thus, on the morning of Saturday, September 13, Thain called Lewis at his North Carolina home and said, "Ken, I think er should talk about a strategic arrangement." Lewis, who had been rebuffed in several previous attempts to acquire Merrill, jumped at the opportunity, telling Thain he could meet him in New York that afternoon.

33.    By 2:30 p.m. that day, Thain and Lewis were sitting alone and face-to-face in BoA's corporate apartment in the Time Warner Center in New York. Thain proposed that "we would be interested in selling a 9.9 percent stake in Merrill to Bank of America." Lewis flatly refused to become a minority investor: "I responded to John, 'That's not really what I have envisioned here. I want to buy the whole company, not invest 9 to 10 percent." Thain ultimately agreed to sell all of Merrill to BoA that Saturday afternoon - provided it was at a significant premium to Merrill's closing price of $17 per share on Friday, September 12, 2008.

34.    As Federal regulators got wind of the deal, they exerted significant pressure on the parties to finalize the transaction before the markets opened on Monday morning, in order to prevent Merrill's collapse and the effect such a collapse would have on the markets. As *PBS Frontline* reported in a program titled "Breaking the Bank," which initially aired on June 16, 1009 (*"PBS Frontline")*, "Paulson was adamant the deal had to be done by Monday morning." According to Thain, in a personal meeting in New York City on Sunday September 14, Federal regulators exerted "very strong[]" pressure to finalize the proposed merger immediately:

11

| Thain: | Hank [Paulson] in particular was very strongly encouraging me to make sure that I got a transaction done prior to the opening on Monday. And so they were very concerned that if Lehman were to go bankrupt what the implications might be for Merrill. And so they very much wanted us to get the transaction done. |
| --- | --- |
| Question: | What form does that "strongly encouraging" take? How strongly? |
| Thain: | You know, in a meeting, it is "John, you's better make sure this happens." |
| Question: | That straightforward? |
| Thain: | Mn-hmm. |

35.     Accordingly, on September 14, 2008, only one day after Thain had first contacted Lewis

to discuss a strategic investment, Lewis agreed on BoA's behalf to pay $50 billion for Merrill in

an all-stock transaction whereby each share of Merrill would be exchanges for 0.8595 shares of

BoA. The agreement valued Merrill stock at $29 per share - a 70% premium to Merrill's $17 per

share closing price on September 12.

36.     Unbeknownst to the shareholders and investors, BoA's and Merrill's senior officers spent

a large portion of their limited time during the merger discussions negotiating the bonuses that

Merrill's senior officers and employees would receive as part of the deal. In fact, Thain stated on

September 17, 2009 that these bonuses were one of the three "main thing" the parties negotiated,

with the other two being the "price" to acquire Merrill and the MAC. Lewis and Thain were

involved in and kept continually apprised of these bonus negotiations. Lewis negotiated the

bonus agreement through Greg Curl, BoA's Global Corporate Strategic Development and

Planning executive. According to Thain's deposition testimony, he was kept informed of the

negotiations, and all the terms of the agreement, through Greg Fleming, Merrill's President and

12

Chief Operating Officer.

37.    According to a February 8, 2009 article in *The New York Times*, during these bonus

negotiations, "a page was ripped from a notebook, and someone on Merrill's team scribbled

eight-digit figures for each of Merrill's tope five executives, including $40 million for Mr. Thain

alone." Subsequent media reports revealed that the list also provided for $30 million  for

Fleming, and $15 million to $20 million each for Merrill's Chief Financial Officer Nelson Chai,

President of Global Wealth Management Robert McCann, and General Counsel Rosemary

Berkery. In total, Merrill sough to the right to pay up to %5.8 billion in discretionary year-end

and other bonuses to its executives and employees.

38.    Significantly, during these discussions, Merrill's senior executives also insisted that BoA

agree to allow Merrill to <u>accelerate</u> payment of these bonuses so that they could be paid in

December 2008 - before the merger was scheduled to close on January 1, 2009, and before

Merrill's financial results for the fourth quarter became public.  This accelerated schedule

deviated from Merrill's compensation practices and regular bonus schedule, under which annual

bonuses were not even calculated, let alone paid, until January - <u>after</u> the close of the fiscal year.

39.    Indeed, according to Merrill's 2008 Definitive Proxy, which was filed with the SEC on

March 14, 2008 (the "March 2008 Proxy") and later incorporated by reference into the merger

Proxy, "pay for performance" was "the core of [Merrill's] compensation policy", and executive

bonuses were "paid in January for performance in the prior fiscal year." The March 2008 Proxy

also stated that "[t]he goal of [Merrill's] compensation programs is to provide an integral link

between pay and performance and to fully align the interests of employees with those of

shareholders," and that "the financial performance of the Company as a whole had to be the

13

dominant consideration in formulating [Merrill's compensation determinations."

40.     The negotiations over the size of the bonus pool dragged on for hours, delaying the signing of the Merger Agreement until almost 2 a.m. on September 15, 2008, even though, at approximately 1 a.m., Lehman filed for bankruptcy - bringing Merrill to the precipice of collapse.

41.     Ultimately, BoA agreed to permit Merrill to pay, pursuant to Merrill's Variable Inventive Compensation Program ("VICP"), up to $5.8 billion in discretionary bonuses to its executives and employees prior to the close of the merger. This highly material amount was equal to 12% of the value of the merger, and was in fact 26% more that BoA had earned during the first two quarters of 2008. It also represented 77% of Merrill's record earnings of $7.5 billion for all of 2006; nearly 30% of Merrill's total stockholders' equity as of December 26, 2008; and over 8% of Merrill's total cash as of December 26, 2008.

42.     The $5.8 billion in bonuses that BoA agreed to allow Merrill to pay was actually materially greater than the bonuses that Merrill itself had internally planned to pay prior to the collapse of the financial industry that occurred in the second half of 2008. Prior to the merger negotiations, Merrill had reduced its internally-projected bonus pool from $5.8 billion to $5.1 billion, or by 16.5%. Thus, the agreement with BoA permitted Merrill to pay bonuses that were at least $700 million greater than Merrill itself had contemplated, and that carried a recorded expense that was larger by $1 billion.

43.     BoA also permitted Merrill to pay these bonuses before the merger's scheduled closing date of January 1, 2009, ahead of Merrill's normal schedule. As Thain testified in his February 19, 2009 deposition: "The timing ... was determined when we signed the merger agreement. The timing was contemplated when, in September, to be prior to the close, and the expectation was

14

always that the close would be on or around December 31."

44.     The acceleration of the bonuses was material in BoA shareholders for several reasons. First, paying the bonuses in December meant that Merrill executives would be able to reap gigantic bonuses despite Merrill's 2008 financial performance.

45.     Second, the accelerated schedule eliminated any chance that BoA might reduce or eliminate Merrill's bonus payments once BoA assumed control of Merrill after the merger closed. As the Associated Press reported on January 22, 2009, "had Thain not acted early, it would have been up to Bank of America to pay or reduce the bonuses later." As Merrill's executives knew, BoA's compensation policies were substantially less generous than Merrill's making it likely that BoA would severely curtail Merrill's bonuses - especially if Merrill suffered large losses during the fourth quarter - unless Merrill secured the right to pay them on an accelerated basis at the time Merrill negotiated on other merger terms. This was confirmed by BoA's Head of Human Resources, Andrea Smith ("Smith"), who testified in a deposition taken by the New York Attorney General's office that there was a "giant gap" between Merrill's bonus numbers and BoA's - so big, in fact that Smith gave "an example of someone in a role at Merrill that got paid three dollars, and the same role in Bank of America would have gotten paid one dollar."

46.     Third, paying billions of dollars in bonuses before the merger closed meant that BoA shareholders would receive an asset worth billions of dollars less than contemplated.

47.     On *PBS Frontline*, Lewis states that the bonuses were so large that they ruined the celebratory toast he has hoped to enjoy on September 15, 2008: "[P]etty kind of things and selfish things start to crop up at the very end [ of the merger process]. And frankly, it extends

15

things to the point that I have never really been real happy by the time that champagne pours. Usually, you're mad at each other by then and you drink it politely and then leave ... And that was about how I felt with this one."

48.      On the morning on Monday, September 15, 2008, BoA and Merrill issued a joint press release in which they announced that BoA had agreed to acquire Merrill for $50 billion in stock in a deal that created an "unrivaled" financial services company and was schedule to close on January 1, 2009. In an investor conference call and press conference BoA representatives rebutted any suggestion that BoA had made a hasty or precipitous decision to acquire Merrill, and made a series of false statements designed to assure investors that BoA had conducted comprehensive due diligence of Merrill, that there had been no regulatory pressure to finalize the transaction on an expedited basis, and that the large premium was justified because Merrill was financial stable.

49.      For example, when asked about the due diligence BoA conducted, Lewis falsely stated that it was "very, very extensive" included a "comprehensive" analysis of Merrill's financial condition, and had established that Merrill had "dramatically" reduced its risky assets and write-downs, thus creating "a much more lower risk profile" than its previously possessed. In order to emphasize how familiar BoA was with Merrill's financial condition with respect to any asset valuation issues, Lewis added that "we have very similar methodology valuations and we have very similar marks. The structures - we're dealing with the same counterparties on things. So again, back to the earlier point, we're pretty familiar with the types of assets and feel pretty good about the progress that Merrill Lynch had made itself."

50.      Further, when asked whether there was "any pressure on the part of regulators" to

16

consummate the deal so quickly, Lewis falsely stated: "First of all, there was no pressure from regulators ... absolutely no pressure," adding that the substantial premium was justified because "Merrill Lynch would have seen this [financial meltdown] through if they had been independent."

51.     On September 18, 2008, BoA and Merrill each filed copies of the Merger Agreement with the SEC on Forms 8-K, which explained that the Merger Agreement was being provided to investors so that they could understand its terms. The Merger Agreement did not say a word about the $5.8 billion in bonuses that BoA had agreed to let Merrill pay its executives and employees or that these bonuses would be paid on an accelerated basis, before the merger closed.

52.     To the contrary, the Merger Agreement contained a materially misleading statement in a section entitled "Company Forbearances," which represented that Merrill would not , without prior written consent of BoA:

> (i) increase in any manner the compensation or benefits of any of the current or former directors, officers, or employees of [Merrill] or its Subsidiaries (collectively, "Employees"), [or] (ii) pay any amounts to Employees not required by any current plan or agreement (other than base salary in the ordinary course of business).

53.     Thereafter, between September 18 and November 3, 2008, when the definitive Proxy was filed with the SEC on Forms DEFM14A and 424 (b)(3) and mailed to shareholders, BoA and Merrill continued to make numerous positive statements reassuring investors about their financial condition, the merger, and the combined company. For example, on October 7, 2008, BoA conducted the Secondary Offering, selling 455,000,000 shares of common stock at $22 per share, for net proceeds of $9.9 billion. In the press release announcing the offering, Lewis underscored BoA's "strength and stability," and falsely stated that the merger "should

17

significantly enhance our earnings." On a related investor and analyst conference call, executive Joe Price ("Price"), responding specifically to a question regarding any need for additional capital in connection with the merger, affirmatively stated that no new capital would be necessary.

54.     On October 16, 2008, Merrill issued a press release in which Thain misleadingly stated that Merrill "continued to reduce exposures and de-leverage the balance sheet prior to the closing of the Bank of America deal, " and that, as a direct result, "we believe even more that the transaction will create an unparalleled global company with pre-eminent ... earnings power."

55.     On October 13, 2008, the U.S. Government took the extraordinary step of requiring the nation's largest banks and financial institutions to accept billions of dollars in government aid pursuant to the "Troubled Asset Relief Program," or TARP. On October 19, 2008, Lewis appeared on *60 Minuted* and assured investors that BoA had actually benefitted from the financial crisis because, in contrast to other banks, consumers were attracted to BOA's stability and thus were making deposits at a record pace, enhancing BoA's capital position. Lewis represented that the Merrill transaction proved that BoA's capital strength had enabled it to defeat and absorb weaker banks, and that BoA had "won its competition with Wall Street."

56.     Lewis further stated that BoA did not need the TARP funding it had recently received, but that Secretary Paulson had forced Lewis to accept it with "no negotiations." Lewis explained that he acceded to Secretary Paulson's ultimatum only because he did not "want to expose" other banks in the group that "really needed the capital," and therefore accepting the funds "was the right thing for the American financial system, and ... the right thing for America."
In contrast to institutions that needed TARP funds to repair their capital bases, Lewis stated that BoA would "use [the TARP funds] to grow loans and to make more net income."

18

57.    Unbeknownst to BoA's shareholders and investors, throughout October and November 2008 - while BoA and Merrill were soliciting shareholder approval of the merger - Merrill was suffering undisclosed losses that were so large they threatened the viability of the combined company if the merger was approved.

58.    In October 2008, the first full month after the merger was announced, Merrill suffered losses of approximately $7 billion. As Thain admitted in his interview with *PBS Frontline:*

> If you look at what actually happened in the fourth quarter, <u>October was the worst month,</u> which is not surprising, because it comes right after the Lehman bankruptcy. <u>We lost about $7 billion in the month of October</u> ... October was by far the worst.

59.    In November 2008, Merrill continued to suffer billions of dollars in losses. According to an expert analysis of Merrill's weekly loss data for the fourth quarter - which was prepared by Congress to determine "what loss trends could reasonably be deduced from the loss data available to [BoA's] decision makers" at the time - by November 14, Merrill: (i) had lost at least another $2 billion; (ii) was on pace to continue to lose at least $1 billion per week through the end of the quarter; and (iii) had losses that were accelerating.

60.    By the end of November 2008, Merrill's losses for October and November exceeded $15 billion - an amount that was substantially more than the record $12.8 billion pre-tax loss Merrill reported for the entire 2007 fiscal year. As *The Wall Street Journal* reported on February 5, 2009, after reviewing an "internal document" which reported the losses, "<u>internal calculations showed Merrill had a horrifying pretax loss of $13.3 billion for the previous two months, and December was looking even worse.</u>"

61.    In addition to these highly material losses, according to a September 8, 2009 letter from

19

the New York Attorney General's office, in "November 2008, Merrill determined that it would need to take a goodwill charge of approximately $2 billion, due partially to the complete failure of Merrill's 2006 acquisition of First Franklin Financial Corporation, one of the leading originators of sub-prime residential mortgage loans." This impairment would be charged against Merrill's income. Including this $2 billion goodwill impairment, Merrill's total losses and impairments by the end of November 2008 totaled $15.3 billion.

62.     Judged by any measure, Merrill's undisclosed losses were highly material to BoA shareholders and investors. The undisclosed losses were large enough to bankrupt Merrill, and so large that BoA did not have the capital to absorb them. Indeed, Merrill's losses were substantially greater than the $5.8 billion BoA had earned through the first nine months of 2008. Further these losses were entirely unexpected by the investment community. After Merrill highlighted the "significant progress in balance sheet and risk deduction" it had supposedly achieved in its October 16, 2008 press release, discussed above, analysts' consensus expectations as reported by Thomson First Call were for Merrill to earn a fourth quarter profit of $0.44 per share.

63.     BoA knew of Merrill's losses as they occurred. According to a February 8, 2009 *New York Times* article, "Bank of America, shortly after the deal was announced, quickly put 200 people at the investment bank, including a large financial team," to continuously monitor Merrill's financial condition. As Thain wrote in January 26, 2009 memo to Merrill employees addressing Merrill's fourth quarter losses:

> We were completely transparent with Bank of America. They learned about these losses when we did. The acting CFO of my businesses was Bank of America's former Chief Accounting Officer. They had daily access to pour P&L [profit and

loss statements], our positions and our marks.

64.    Moreover, Thain testified in his deposition that BoA executives not only had access to this detailed financial information, but personally received regular updates as the fourth quarter progressed. Thain testified that Merrill held meetings each Monday to discuss the prior week's financial results, and "[t]he acting chief financial officer, Neil Cotty, sat in meetings and discussions and was totally up-to-speed on what was happening" throughout the fourth quarter.

65.    During Thain's *PBS Frontline* interview, he explained in greater detail that both he and Merrill's senior executives, as well as BoA and its senior executives, all received daily, "step-by-step" updates on Merrill's financial condition:

| Question: | And was Bank of America inside your books? ... Would they have known what was happening, what the projections were, how bad things actually were because of the Lehman collapse and what else had happened in the market? |
| --- | --- |
| Thain: | Yes, absolutely. I believe in being totally transparent. They had acquired us. We were completely transparent with them. They had inserted the person who had been their chief accounting office - he became the acting chief financial officer for the Merrill businesses. We generate a daily profit and loss statement. They were getting that daily profit and loss statement, so they knew About the lsoses at the same time we did. |
| Question: | Which was when? |
| Thain: | We get an update every day. |
| Question: | So they would have known all the way along? |
| Thain: | All the way along. |
| Question: | Step by step? |
| Thain: | Yes. |

21

66.     Indeed, BoA has admitted that it was aware of Merrill's financial condition. As reported in the February 8, 2009 *New York Times* article, "a Bank of America spokesman said that 'we have not disputed that we were kept informed about the financial condition of the company.'"

67.     As set forth below, although Lewis initially told Federal regulators that he was "surprised" by the size of Merrill's losses, he has since admitted in sworn testimony before Congress that he was aware at the time of the losses that occurred during October and November 2008. Lewis was asked by one Representative whether BoA received "detailed financial reports every week from Merrill Lynch after signing the merger agreement on September 15th? Lewis replied, "That is true." The Representative also asked Lewis, "Now Mr. Lewis, isn't it true that you understood the composition and performance of Merrill's portfolio because it was similar to your own . . .? Isn't that true?" Again, Lewis replied, "It is true." At a later point in Lewis's testimony, another Representative asked whether any of the 200 financial analysts that BoA stationed at Merrill immediately after the merger announcement reported Merrill's losses to Lewis before the shareholder vote. Lewis responded, "I apologize if I haven't been clear. The - we did have people there, and we did know that there were losses. And that was clear both at our company and theirs."

68.     Similarly, in a February 26, 2009 deposition taken by the New York Attorney General's office, Lewis stated that: "We were getting projections. I was getting a P and L at Bank of America, but we were getting projections [for Merrill]. I don't recall getting them every day, but I was either hearing about them and in some cases I saw them."

69.     In fact, Lewis led weekly calls during which he and Price actively discussed Merrill's growing losses with the BoA Board. As *The Wall Street Journal* reported on September 17,

2009, "Before the shareholder vote, directors participated in weekly conference calls led by Mr. Lewis that included updates from the bank's chief financial officer, Joe Price, on Merrill's estimated fourth-quarter losses, said one person familiar with the calls."

70.     Merrill's losses in October and November 2008 were so significant that, in the days and weeks leading up to the shareholder vote, senior BoA executives discussed terminating the deal on several occasions. According to a February 5, 2009 article in *The Wall Street Journal,* "shortly before Thanksgiving," BoA's senior "executives debated whether Merrill's losses were so severe that the bank could walk away from the deal , citing the 'material adverse effect' clause in its merger agreement." The debate over whether to invoke the MAC continued "up until a few days before shareholders of Merrill and Bank of America were scheduled to vote."

71.     The New York Attorney General's investigation confirms these facts. According to the New York Attorney General's September 8, 2009 letter, "prior to the shareholder vote," Merrill had suffered "more than $14 billion" of losses, which were "so great that Bank of America officers sought guidance -- <u>before Bank of American shareholders approved the merger</u> -about the applicability of the material adverse change ("MAC") clause . . . . Yet Bank of America failed to disclose those large and increasing losses to its shareholders prior to the December 5, 2008 vote." (Emphasis in original). Indeed, according to the New York Attorney General, BoA's senior executives, including Price, discussed "whether Bank of America had a MAC in light of Merrill's deteriorating financial condition" on three separate occasions in the weeks before the vote, namely, on November 20, December 1, and December 3, 2008. On each occasion, BoA's senior officers, including Price, made a "decision not to disclose these escalating losses."

72.     Certain BoA executives insisted that if the Company was not going to terminate the

merger, shareholders should at least be told of Merrill's losses so that they could case their vote with knowledge of material facts. According to the February 5, 2009 *Wall Street Journal* article quoted above, "[t]here was disagreement inside the bank about whether to tell shareholders about Merrill's losses," and this disagreement continued right up until "the night before the vote." As *The Wall Street Journal* reporter, Dan Fitzpatrick, later explained on *PBS Frontline, that investors should know about this before they vote."

73.     At the same time that Merrill was collapsing, unbeknownst to investors, BoA's own financial condition was materially deteriorating to the point where BoA would be unable to absorb the losses suffered by Merrill. As set forth in an internal Federal Reserve memorandum titled "Analysis of Bank of America & Merrill Lynch Merger" (the "Federal Reserve Merger Analysis"), before the merge, BoA had incurred a loss of almost $800 million, and was projecting a total fourth quarter loss of $1.4 billion – the first quarterly loss in BoA's history . . . In a December 19, 2008 email, Tim Clark, a Senior Advisor at the Federal Reserve, highlighted Boa's own financial deterioration, writing that, "[a]s they {BoA senior executives] themselves noted the other night at our meeting, even on a stand alone basis, the firm is very thinly capitalized," BoA had used "quite optimistic underlying assumptions for the economy and performance of assets," and was "clearly not ... well prepared for any further deterioration."

74.     While the financial condition of both Merrill and BoA deteriorated, executives at both companies found the time to finalize the billions of dollars of bonuses that they had agreed would be paid in December 2008 to Merrill executives and employees. According to Thain's deposition testimony, in early November 2008, he and BoA's Chief Administrative Officer, Steele Alphin ("Alphin"), jointly determined and approved the size and composition of the final bonus pool,

24

which was $3.6 billion. On November 11, 2008, Thain presented the final bonus numbers and accelerated payment schedule to Merrill's Compensation Committee for review. Merrill's Compensation Committee approved the accelerated schedule as follows: final approval of the bonuses would occur on December 8, 2008, one business day after the shareholder vote; employees would be informed of their bonuses on December 22; and employees would receive their cash awards by December 31. On November 12, Thain informed Alphin of the precise dates involved in the accelerated schedule.

75.     Throughout this process, BoA's senior executives knew of the size and timing of the bonus payments. As Thain stated to *PSB Frontline:* [T]here was complete transparency with them starting from September when they agreed to the bonuses, all through the period of time until they were ultimately paid."

76.     Notwithstanding the facts set forth above, the Proxy failed to disclose at any time before the shareholder vote on the merger any information about the billions of dollars in losses that had been suffered by either Merrill of BoA during October and November. The Proxy also failed to disclose that Merrill would pay billions of dollars of bonuses before the merger's scheduled closing date, the payment of which further weakened Merrill's financial condition; that BoA's due diligence of Merrill was completely inadequate; and that regulators had exerted intense pressure on the parties to sing the Merger Agreement within 36 hours.

77.     On November 3, 2008, the Proxy was filed with the SEC on Forms DEFM14 and 424(b)(3) and mailed to shareholders. The Proxy made on mention of th $7 billion in fourth quarter losses that Merrill had suffered by this date. Instead, the Proxy falsely represented that there was an "absence of material adverse changes" to Merrill's financial condition, the merger

25

was "fair" to BoA shareholders, and the "strong capital position" of the "combined company" was a "material factor" favoring the merger.

78.     The Proxy also affirmatively misrepresented that Merrill would <u>not</u> make any discretionary bonus payments before the merger closed on January 1, 2009. Indeed, the Proxy identified discretionary compensation as an "extraordinary action," and assured investors that "Merrill Lynch <u>will not</u>" pay any compensation that was "not required." In addition, the Merger Agreement, which was attached to the Proxy as Appendix A, repeated the assurances as to discretionary compensation originally set forth in the September 18, 2008 Forms 8-K, described above. Moreover, by incorporating Merrill's prior SEC filings, including the March 2008 Proxy, the Proxy falsely assured investors that Merrill's "annual incentive compensation (annual bonus)" for executive officers is "paid in January for performance in the prior fiscal year," and "provide[s] an integral link between pay and performance," as set forth above.

79.     Significantly, in the weeks after the Proxy was mailed to shareholders, BoA and Merrill updated the Proxy on at least two occasions, without disclosing any material facts concerning the losses at Merrill or BoA, or the accelerated bonus payments. Rule 14a-9 specifically required BoA to disclose any "material fact . . . necessary to correct any statement in any earlier communication" that was false or misleading or had "become false or misleading" due to intervening events. Both Proxy supplements violated this rule.

80.     Specifically, on November 21, 2008, BoA and Merrill each filed a Form 8-K pursuant to SEC Rule 425, updating the Proxy to disclose that they had settled certain derivative litigation relating to the merger and, as a condition of the settlement, had agreed to make certain disclosures in the Form 8-K related to the background of the merger -- without disclosing any

26

information concerning Merrill's losses, the secret bonus agreement, or BoA's own deteriorating financial condition.

81.     Then, on November 26, 2008, with the vote less than ten days away, BoA again supplemented the Proxy with the stated purpose of bolstering BoA's stock price, by filing a letter from Lewis to shareholders pursuant to Rule 14a-6(b) that falsely assured shareholders that BoA's financial condition remained extremely strong despite the upheaval in the market. In that letter, which was written specifically to address investors' "deep concerns about . . whether financial institutions have enough capital," Lewis falsely represented that BoA was "one of the strongest and most stable major banks in the world," as well as "one of the most liquid banks in the world." Once again, Lewis failed to disclose any of the materially adverse undisclosed information set forth above.

82.     On December 5, 2008, BoA shareholders convened in Charlotte, North Carolina to vote on the merger, while Merrill shareholders convened in New York. BoA and Merrill shareholders voted in favor of the merger. Lewis represented that the merger was the crowning event in BoA's corporate history, noting that, "it puts us in a completely different league." BoA also issued a press release in which Lewis again falsely stated that the merger would create the "premier financial services franchise" in the world.

83.     On Tuesday, December 9, 2008, the second business day following the shareholder vote, Lewis and Price met with the BoA Board to discuss Merrill's deteriorating financial condition. At the meeting, Price, relying on loss figures known to him and BoA, Merrill, Thain, Lewis and Cotty and calculated before the shareholder vote, acknowledged that the massive projected fourth quarter losses at Merrill were material to investors. According to an August 6, 2009 *Wall Street*

27

*Journal* article, Price "used the $9 billion [after taxes] net loss estimate [circulated amongst management on December 3, 2008 in advance of the shareholder vote] in a presentation to Bank of America' Board. The 'magnitude' of the losses 'is quite significant,' he said ..." Merrill's losses were so severe that, according to the February 5, 2009 *Wall Street Journal* article, by no later than December 14, 2008, "Lewis [had] told Bank of America directors in a conference call that the bank might abandon the acquisition which was supposed to close in two weeks."

84.    Having acknowledged that Merrill's losses were so massive that they threatened BoA's solvency, on the morning of December 17, 2008, Lewis called Secretary Paulson and told him that BoA had concluded that it had grounds to invoke the MAC and was "strongly considering" doing so, according to Lewis' deposition testimony. Secretary Paulson immediately ordered Lewis to fly up to Washington, D.C. for a meeting that evening at 6 p.m. at the Federal Reserve.

85.    On the evening of December 17, 2008, Lewis and Price met with Secretary Paulson, Chairman Bernanke, Federal Reserve General Counsel Scott Alvarez ("Alvarez"), and other Treasury and Federal Reserve officials. Lewis began the discussion by reporting the dire financial condition of the combined company. Lewis stated that BoA was projected to lose $1.4 billion in the fourth quarter – the Company's first quarterly loss in its history. Lewis then reported that Merrill's massive fourth quarter losses were so large that they would devastate BoA's tangible common equity and Tier 1 capital ratios, bringing the Company to the brink of insolvency. Price's handwritten notes from the meeting, released by Congress, show that Lewis told the regulators that Merrill had recently suffered "unusual" losses and was now projecting losses of approximately $18 billion on a pretax basis, which amounted to a $12.5 billion net loss after taxes. Lewis stated that BoA had concluded that a material adverse change had occurred in

28

Merrill's financial condition, and that it would terminate the merger pursuant to the MAC.  In an effort to explain his failure to disclose these losses earlier, Lewis falsely claimed that he only learned of Merrill's losses in mid-December, when they supposedly suddenly accelerated.

86.      Chairman Bernanke and Secretary Paulson both urged Lewis not to invoke the MAC, opining that such an action would have serious repercussions for BoA and Merrill.  In response, Lewis raised the idea of BoA receiving a taxpayer bailout - including a "Citi-type" guarantee on $50 billion of assets - to proceed with the transaction, according to Price's handwritten notes. Secretary Paulson asked for time to allow the Treasury and Federal Reserve to analyze the situation.  Lewis agreed to supply the Federal Reserve with information on Merrill's and BoA's fourth quarter performance and risk exposures, and to wait to hear back from the regulators before taking further action.

87.      After reviewing Merrill's internal data, senior Federal Reserve officials expressed their disbelief regarding Lewis's claims that he was recently surprised by the size of Merrill's losses. As Kevin Warsh, a member of the Board of Governors of the Federal Reserve, flatly stated in one email: "This claim is not credible."  On December 19, 2008, Tim Clark, a Senior Advisor in the Federal Reserve's Division of Banking Supervision and Regulation, emailed other Federal Reserve officials that Merrill's losses were clear from the beginning of the fourth quarter, and that any claim of "surprise" was dubious:

> General consensus forming among many of us working on this is that given market performance over past several months and the clear signs in the data we have that the deterioration at [Merrill] has been observably under way over the entire quarter - albeit picking up significant[ly] around mid-November and carrying into December - Ken Lewis' claim that they were surprised by the rapid growth of the losses seems somewhat suspect. At a minimum, it calls into question the adequacy of the due diligence process [BoA] has been doing in

preparation for the takeover.

88.     As the above email provides, after reviewing BoA's internal data and Merrill's losses,

numerous senior Federal Reserve officials concluded that, in contrast to Boa's public statements,

the due diligence that BoA had conducted on Merrill had been grossly "deficient." For example,

on December 20, 2008, Deborah Bailey, deputy director of the Banking Supervision and

Regulation Division at the Federal Reserve, sent an email stating that, "I always had my doubts

about the quality of the due diligence they did on the [Merrill] deal. Don't forget they paid a

premium. How do you pay a premium and now ask for help? This will not go over well at all."

89.     Senior Federal Reserve officials repeated these conclusions in the Federal Reserve

Merger Analysis, which stated:

> While the extent of the market disruption that have occurred since mid-
> September were not necessarily predictable, [BoA] management's contention that
> the severity of [Merrill's] losses only came to light in recent days is problematic
> and implies substantial deficiencies in the due diligence carried out in advance of
> and subsequent to the acquisition.

90.     According to the Federal Reserve Merger Analysis, BoA had failed to adequately

consider or assess Merrill's largest risk exposures. As that Analysis stated, the "single largest

area of risk exposure and driver of recent losses that have been identified by management" was

Merrill's "large losses stemming from exposures to financial guarantors." These exposures and

losses, Federal Reserve officials concluded, "were clearly shown in Merrill Lynch's internal risk

management reports that [BoA] reviewed during their due diligence." In addition, Federal

Reserve officials concluded that the balance of Merrill's "risk exposures cited by management. . .

should also have been reasonably well understood, particularly as [BoA] itself is also active in ...

these products."

91.     The Federal Reserve Merger Analysis highlighted the "problematic" nature of Lewis's claim of surprise given the fact that the Proxy "explicitly assert[ed] that [BoA] has an understanding of [Merrill's] business activities, financial condition and prospects as well as an understanding of the outlook for the firm based on prospective economic and market conditions."

92.     Lewis himself acknowledged to Federal Reserve officials that BoA had not conducted adequate due diligence. In a December 23, 2008 internal Federal Reserve email, Federal Reserve Senior Vice President Mac Alfriend reported that Lewis "is worried about stockholder lawsuits; knows they did not do a good job of due diligence and the issues facing the company are finally hitting home and he [Lewis] is worried about his own job after cutting loose lots of very good people."

93.     As noted above, evidence emerging as a result of federal and state investigations of the merger has confirmed that Lewis was aware of the losses at Merrill much earlier than mid-December 2008. Among other things, as noted above, the New York Attorney General has stated that evidence uncovered during its investigation established that, before the shareholder vote, BoA's executives (i) were fully aware of at least $14 billion of losses at Merrill and $2 billion in goodwill impairments; (ii) were so concerned with the magnitude of these combined losses that they repeatedly discussed invoking the MAC or otherwise disclosing them to shareholders; and (iii) were not credible in claiming that Merrill's losses and goodwill impairments were "surprising."

94.     On December 19, 2008, Lewis and Price again spoke with Secretary Paulson, Chairman Bernanke, and other Treasury and Federal Reserve officials. According to Price's handwritten notes of the meeting, Lewis reported that Merrill was now projected to have fourth quarter losses

31

in excess of $21 billion pre-tax and that Boa would likely invoke the MAC.  Secretary Paulson

asked Lewis what needed to be done to have the deal proceed.  Lewis raised two possibilities: the

government could purchase Merrill's toxic assets directly, or provide an asset guarantee to BoA.

95.     Price's handwritten notes show that Federal Reserve officials unequivocally told Lewis

that a decision by BoA to invoke the MAC would reveal that BoA's prior statements about the

merger and its due diligence were false, and would further cause the market to seriously

questions BoA's financial condition and the judgment of its management.  Chairman Bernanke

testified before Congress that he told Lewis that "an attempt [by BoA] to invoke the MAC after

three months of review, preparation and public remarks by the management of Bank of America

about the benefits of the acquisition would cast doubt in the minds of financial market

participants, including the investors, creditors and customers of Bank of America about the due

diligence and analysis done by the company, its capacity to consummate significant acquisitions,

its overall risk management processes and the judgment of its management."

96.     On December 21, 2008, Lewis called Secretary Paulson on his cell phone, reaching him

at a ski cabin in Colorado, to discuss the situation further.  Secretary Paulson bluntly told Lewis

that the Federal Reserve would remove BoA's board and management if it tried to terminate the

transaction.  According to Secretary Paulson's testimony before Congress:

> It was ... appropriate for me to remind him under such circumstances [that] the
> Federal Reserve could invoke its authority to remove management and the board
> of Bank of America. I intended my message to reinforce the strong view that had
> been expressed by the Fed and which was shared by the Treasury that it would be
> unthinkable that Bank of America take this destructive action.

97.     The threat to fire Lewis, BoA senior management, and the BoA Board had its intended

effect.  Lewis testified in a deposition taken by the New York Attorney General's office that,

before receiving this threat, "we [BoA] were going to call the MAC." After receiving this threat,

Lewis reversed course. As the New York Attorney General wrote to Congress in a letter dated

April 23, 2009, its investigation established that:

> Secretary Paulson's threat swayed Lewis. According to Secretary Paulson, after
> he stated that the management and the Board could be removed, Lewis replied,
> "that makes it simple. Let's deescalate." Lewis admits that Secretary Paulson's
> threat changed his mind about invoking that MAC clause and terminating the
> deal.

98.     That day, Lewis told Secretary Paulson and Chairman Bernanke separately that BoA

would proceed with the merger and would work with federal regulators on designing a bailout

package. Lewis made the decision to proceed with the merger even though he knew that the

impact of Merrill's losses would harm BoA shareholders. Specifically, at his deposition, Lewis

was asked whether BoA's shareholders were being forced to take "the hit of the Merrill losses,"

and if this "hit" would harm them. He responded that BoA's investors were harmed over the

"short term," which he defined as "[t]wo to three years."

99.     Recognizing that his conduct would likely result in legal liability for misleading

shareholders, Lewis next took the extraordinary step of trying to obtain protection from the

Government against shareholder suits. According to a December 22, 2008 email from Chairman

Bernanke to the Federal Reserve's General Counsel Alvarez, Lewis had just "confirm[ed] his

willingness to drop the MAC," but "he fears lawsuits from shareholders for NOT invoking the

MAC, given the deterioration at [Merrill]." Thus, Lewis had asked Bernanke "whether he could

use as a defense that the [Government] ordered him to proceed for systemic reasons." Bernanke

told Lewis "no."

100.    Chairman Bernanke then asked Alvarez whether the Federal Reserve supervisors could

formally advise Lewis that invoking the MAC was not in the best interests of BoA, and whether

Lewis could use such a letter as a defense from suit. Alvarez responded that such a letter was not

"appropriate." Alvarez also underscored that Lewis faced liability for BoA's lack of disclosures

to shareholders in advance of the shareholder vote. Alvarez wrote:

> Management may be exposed if it doesn't properly disclose information that is
> material to investors. There are also Sarbanes-Oxley requirements that the
> management certify the accuracy of various financial reports. . . His potential
> liability here will be whether he knew (or reasonably should have known) the
> magnitude of the [Merrill] losses when [Boa] made its disclosures to get the
> shareholder vote on the [Merrill] deal in early December.

101.    In a follow-up email to Bernanke on this subject, Alvarez specifically noted that Federal

Reserve officials' conclusions about Lewis's knowledge of Merrill's losses before the

shareholder vote caused "problems" for Lewis under the securities laws:

> [O]nce we're in the litigation, all our documents become subject to discovery and,
> as you'll remember from Deborah's presentation, some of our analysis suggests
> that Lewis should have been aware of the problems at [Merrill] earlier (perhaps as
> early as mid-November) and not caught by surprise. That could cause other
> problems for him around the disclosures [BoA] made for the shareholder vote.

102.    Ultimately, in order to proceed with the merger, Lewis requested and obtained a $138

billion taxpayer bailout, consisting of a $20 billion capital infusion in exchange for a sale of

preferred stock, and a guarantee against losses on $118 billion of high-risk assets, the large

majority of which came from Merrill. In a BoA Board meeting on December 22, 2008, Lewis

told the BoA Board that he and Government officials had agreed to this bailout package.

According to the meeting minutes, Lewis informed the BoA Board that "the Treasury and Fed

have confirmed that they will provide assistance to the Corporation to restore capital and to

protect the Corporation against the adverse impact of certain Merrill Lynch assets;" that "the

34

Corporation can rely on the Fed and Treasury to complete and deliver the promised support by January 20, 2009, the date scheduled for the release of earnings by the Corporation;" and that Chairman Bernanke had "confirmed that the [Office of the Comptroller of the Currency], FDIC, the current and incoming Treasury officials, and the incoming economic team of the new administration are informed of the commitment to the Corporation by the Fed and Treasury and that all concur with the commitment of the combined federal regulators ('federal regulators') to the Corporation."

103.    Lewis also made clear that management's recommendation to proceed with the merger was based on, among other things, "the verbal commitment of the Fed and Treasury to have a transaction evidencing the Fed's and Treasury's committed assistance in existence no later than January 20, 2009" and "the assurances which have been made by the Fed and Treasury and clarification that funds under the TARP program are available for distribution to the Corporation to fulfill the commitment of the Treasury and Fed."

104.    Recognizing the material risk that shareholders would demand that the merger be terminated if BoA disclosed the Government bailout before the merger closed - and knowing that, if the merger failed, he, senior management, and the Board would be fired - Lewis concealed the bailout from investors. Specifically, when Lewis learned that the Government would have to disclose that it was providing TARP funding to BoA if the Government's commitment was reduced to writing, Lewis immediately advised the BoA Board that the Company would not enter into a written agreement because it did not want this information to be disclosed in advance of the merger's close. On December 22, 2008, Lewis sent the following email to the Board:

> I just talked with Hank Paulson. He said that there was no way the Federal
> Reserve and the Treasury could send us a letter of any substance without public
> disclosure which, of course, we do not want.

105.    On December 30, 2008, Lewis met with the BoA Board to update them concerning the

U.S. Government's commitment of TARP funds, and further underscored that the deal with the

U.S. Government was firm and detailed. According to the minutes of ths meeting, "management

has obtained detailed oral assurances from the federal regulators with regard to their commitment

and has documented those assurances with e-mails and detailed notes of management's

conversations with the federal regulators." Lewis "discussed in detail several of the

conversations between Mr. Price and Mr. Warsh establishing essential elements of the

commitment of the federal regulators including ... the commitment of the federal regulators to

deliver assistance in the form of capital and asset protection to the Corporation." Lewis added

that:

> management of the Corporation had clearly explained to the federal regulators the
> terms and conditions required by the Corporation to consummate the acquisition
> of Merrill Lynch on January 1, 2009. In return, he reported, management has
> received strong assurances from all relevant federal regulators and policy makers
> that the Corporation will receive adequate and appropriate assets to neutralize the
> impact to the financial condition of the Corporation resulting from the
> Corporation's acquisition of Merrill Lynch on January 1, 2009.

106.    Despite this detailed commitment for a massive taxpayer bailout designed to "neutralize

the impact ... resulting from the Corporation's acquisition of Merrill Lynch," Lewis and the BoA

Board again determined to withhold this information from BoA shareholders and investors.

According to the minutes of the BoA Board's December 30, 2008 meeting: "Mr. Lewis explained

that written assurances would not be received before January 1, 2009 because any written

assurances would require formal action by the Fed and Treasury, which formal action would

require public disclosure." According to the meeting minutes, rather than disclosure information about the Government bailout at that time, BoA determined to announce it "in conjunction with [BoA's] earning release on January 20, 2009."

107.    The New York Attorney General's investigation has further confirmed that, following the shareholder vote, Defendants concealed numerous, highly material facts. According to the New York Attorney General's September 8, 2009 letter:

> Bank of America failed to disclose that it had determined, eight business days after the merger was approved, that it had a legal basis to terminate the merger because of Merrill's losses. Indeed, Bank of America only decided against seeking to terminate the merger when the jobs of its officers and directors were threatened by senior federal regulators. Yet it took Bank of America more than a month to make public disclosure of its dire financial situation - - a month during which millions of shares of Bank of America stock were traded based on entirely inaccurate and outdated financial information. Bank of America further failed to disclose that its officers faced a conflict of interest in responding to the federal government's threat, or that it had received the government's oral commitment to support the merger with taxpayer funds.

108.    By December 31, 2008, Merrill had suffered more than $21 billion in losses for the fourth quarter. On that day - - its last as an independent company - - it paid out the cash component of $3.6 billion in bonuses to its employees and executives, further eroding its value to BoA shareholders.

109.    On January 1, 2009, BoA closed its purchase of Merrill. Even though (i) Merrill had suffered fourth quarter losses of more than $21 billion before taxes; (ii) Boa had suffered its own fourth quarter net loss of $1.8 billion after taxes; and (iii) the Company was so devastated that it required a $138 billion taxpayer bailout to save it from collapse, BoA issued a press release that day falsely representing the merger as "creating a premier financial services franchise" and hailing the "$7 billion in pre-tax expense savings" BoA expected to achieve from the transaction.

37

110.    Based on BoA's false representations to the market as of that date, analysts had previously estimated that BoA would independently report earnings of $0.08 per share for the fourth quarter of 2008. A January 10, 2009 internal Federal Reserve memo entitled "Considerations regarding invoking the systemic risk exception for Bank of America Corporation" underscored the fact that the Defendants' recent statements had misled investors into believing that the combined company was financially healthy. Specifically, the memo stated: "The earnings guidance provided by the firm to the investor community does not infer that 4Q performance at either organization will be as negative as we have been told. Further, a survey of equity analysts suggests that the investor community have significantly more positive expectations regarding fourth quarter performance."

111.    News that BoA would report much higher losses than expected began to leak into the market by no later than January 12, 2009, when a Citigroup analyst wrote that BoA might post a $3.6 billion fourth-quarter loss and slash its quarterly dividend from $0.32 to $0.05 per share. In response, shares of BoA stock fell from $12.099 at the close of the market on the prior trading day to $11.43 - a 12% drop.

112.    According to a June 1, 2009 article in the *Sydney Morning Herald,* on January 14, 2009 in Sydney, which was January 13 in New York, Merrill executives in Australia had informed Australian bond traders that Merrill was going to report "awful" news that was going to cause the market to "plummet" on January 15, 2009. One trader reported that he was told that the "[t]he market is expecting Merrill Lynch in New York to come out with a bad result on Thursday night," and that the news would "start to leak out." BoA shares dropped from a close of $11.43 on January 12, 2009, to a close of $10.65 on January 13, 2009, and fell further to close at $10.20

38

on January 14, 2009, all on heavy volume - - a decline of approximately 11%.

113.     On the morning of January 15, 2009, *The Wall Street Journal* shocked investors with news that "[t]he U.S. Government is close to finalizing a deal that would give billions in additional aid to the Bank of America Corp. To help it close its acquisition of Merrill Lynch & Co." citing larger-than-expected but unquantified fourth quarter losses at Merrill. In response, BoA announced that it was moving its fourth quarter and full-year 2008 earnings call to January 16, 2009, four days earlier than planned. The price of BoA stock fell from $10.20 per share on January 14, 2009 to close at $8.32 per share on January 15, 2009, on extremely heavy trading volume - - an 18% drop which left BoA's share rice at an 18-year low.

114.     On the morning of January 16, 2009, the Treasury Department issued a press release disclosing the Government bailout. Later that morning, *The Wall Street Journal* published an article entitled "Crisis on Wall Street – Bank Stress: BofA's Latest Hit –Treasury to Inject $20 Billion More: Stock at 1991 Level," in which it speculated that Merrill's losses "could total in excess of $10 billion," and further reported that:

> Reeling from previously undisclosed losses from its Merrill Lynch & Co. acquisition, Bank of America Corp. is expected to receive an emergency capital injection of $20 billion from the Treasury, which will also backstop as much as $120 billion of assets at the bank, said people familiar with the plan. Reports of the unexpected Merrill losses sent Bank of America shares to their lowest levels since 1991.... Thursday's 18% stock-market drop gives the Charlotte, N.C. bank a market value of $41.8 billion, a sum below the $46 billion in shares it originally offered for Merrill. Its shares have lost over 40% of their value in the past seven trading sessions. The developments angered some Bank of America shareholders, who began to question why Chief Executive Kenneth Lewis didn't discover the problems prior to September 15 deal announcement. Many also wanted to know why he didn't disclose the losses prior to their vote on the Merrill deal on December 5 or before closing the deal on January 1.

115.     Later that morning, BOA disclosed that (i) Merrill had suffered a fourth quarter after-tax

net loss of $15.31 billion, or more than $21 billion before taxes, which accounted for more than 55R of Merrill's full year after-tax loss of $27 billion; (ii) BOA had suffered its own net loss of $1.8 billion in the fourth quarter; and (iii) the U.S. Government was injecting $20 billion of capital into the Company in exchange for preferred stock, and had agreed to provide protection against further losses on $118 billion of risky assets, primarily from Merrill, for which the U.S. Government would charge a fee of $4 billion in the form of additional preferred stock. With the fourth quarter losses, Merrill had lost $24.44 per share of the year, and $9.62 per share for the quarter, far above what the market had been expecting. Similarly, BOA's own losses meant that it had lost $0.48 [per diluted share, a far cry from the $0.08 per share profit that analysts expected. In addition, BOA announced that it was virtually eliminating its dividend, reducing it from $0.32 to $0.01 per share.

116.    The $24 billion of preferred shares that BOA was required to sell to U.S. Government under the terms of the bailout carried an 8% dividend rate, which would require BOA to pay almost $2 billion per year in dividends to the Treasury Department, thus severely reducing shareholder returns, and diluting the value of BOA common stock by approximately thirty cents per share for 2009. Further, BOA was required to pay the U.S. Government $236 million per year for the asset guarantee, as well as an unspecified fee when it desired to end the asset guarantee - all of which further reduced its future earnings and diluted the value of its common stock. In addition, BoA's acceptance of this additional Government funding, on top of the TARP funds it had previously received, qualified it as a recipient of "extraordinary" Government aid, a status that was so unique that, apart from BoA, the only other "extraordinary" recipients were AIG and Citigroup. This designation, in turn, subjected BoA to additional Government oversight

40

and restrictions.

117.    On the January 16, 2009 conference call to discuss these results, Lewis admitted

that BoA was unable to absorb Merrill's losses without the taxpayer bailout:

> We went to our regulators and told them that we would not - that we could not close the
> deal without their assistance. As a result, we have agreed to the issuance of $20 billion in
> Tier 1 qualifying TARP preferred, as well as the issuance of an additional preferred of $4
> billion in exchange for an asset guarantee....

118.    Analysts and the financial press reacted with astonishment. On January 16, Deutsche

Bank reported that: "While core results [for Bank of America], esp. credit, are worse than

expected, the main negative surprise relates to the Merrill Lynch deal in terms of losses and new

[Government] involvement."

119.    As Lewis admitted on *PBS Frontline*, "The magnitude of the loss, obviously, at

Merrill Lynch really stunned people. And so it was a bad day and it did shock a lot of people and

disappointed a lot of people."

120.    After the close of markets on January 16, 2009, it was reported that Moody's had

downgraded BoA's credit rating due to "the disclosure of substantial losses at Merrill Lynch,"

and Fitch had downgraded Merrill's individual rating to "F" - well below junk status - due to its

"massive losses" and its inability to "survive [] absent assistance provided by the U.S. Treasury."

121.    On Saturday, January 17, 2009, *The New York Times* published a lengthy article

describing Merrill's massive losses as "devastating" and revealing that BoA's management had

contemplated exercising the MAC after the cote but prior to the closing of the merger, and was

dissuaded by the Government from doing so. In addition, *The Wall Street Journal* reported that

BoA's own weakened financial condition contributed to the need for Government aid.

41

122.    The next trading day, Tuesday, January 20, 2009 (following the weekend and the

Martin Luther King, Jr. Holiday) J.P. Morgan reported that BoA's fourth quarter losses were

"enormous," adding:

> [BoA] Announced a major agreement with the U.S. government that reflected primarily
> the poor acquisition of [Merrill] done without due diligence as well as some assets from
> its own weakening portfolio. [Merrill] over-represented its value given its large amount
> of high risk assets and the level of permanent dilution for [BoA] from the acquisition will
> likely be higher.

123.    In direct response to these disclosures, BoA shares fell from $8.32 per share, their

opening price on January 16, 2009, to a closing price of $5.10 per share on January 20, 2009 - a

drop of 38.7% on extremely heavy volume over two days of trading.

124.    In only six trading days between January 12, 2009 and January 20, 2009, as investors

learned the truth about this materially adverse information, BoA stock plummeted from $12.99 to

$5.10 - a decline of 60% - causing a market capitalization loss of over $50 billion. Even at this

price, BoA stock remained artificially inflated because news of the massive bonuses had yet to be

disclosed.

125.    Then, on January 21, 2009, just before midnight, the *Financial Times* broke the story of

Merrill's accelerated bonus payments, reporting that Merrill has taken "the unusual step of

accelerating bonus payments by a month last year." Although the amount of the bonuses was not

public, the *Financial Times* further reported that "a person familiar with the matter estimated that

about $3bn to $4bn was paid our in bonuses in December," before the merger closed. According

to the article, Nancy Bush, a bank analyst with NAB Research, described the bonuses as

"ridiculous," especially in light of Merrill's losses.

126.    After the *Financial Times* broke the news of Merrill's bonus payments, on the morning of

42

January 22, 2009, Lewis flew from Charlotte, North Carolina to New York City and fired Thain after only 22 days in his new job. According to Thain's *PBS Frontline* interview, the conversation took "two minutes," during which Lewis told Thain, "You are going to take the blame for the fourth quarter losses."

127.    On January 22, 2009, the Associated Press reported that the revelation of the accelerated bonus payments amidst Merrill's losses triggered Thain's purported "resignation," writing, "John Thain resigned under pressure from Bank of America on Thursday after reports he rushed our billions of dollars in bonuses to Merrill Lynch employees in his final days as CEO there, while the brokerage was suffering huge losses and just before Bank of America took it over."

128.    The financial press uniformly reported that the size and accelerated schedule of Merrill's bonus payments - as well as the fact that they were paid amidst historically large losses - was stunning news to the investor community and directly contributed to Thain's departure. For example, on January 23, 2009, *The Wall Street Journal* reported that Thain's firing took "less than 15 minutes" and was precipitate in party by "[v]itriol... over Merrill paying out bonuses much earlier than expected," which would have likely been "cut amid a much leaner plan at Bank of America" had they not been "accelerated." Similarly, the *Charlotte Observer* reported that "Thain's departure follows a raft of damaging revelations in recent days, including bigger-than-expected fourth-quarter losses at Merrill, executive defections and disclosure of 11th-hour bonus payments to Merrill employees before the deal closed." The *Los Angeles Times* reported on January 23, 2009 that it was "revealed Thursday that Merrill had moved up the payment of employee bonuses to days before the merger closed," and the Associated Press reported that "on Thursday came the news that [Lewis] didn't block Merrill management's decision to dole out

43

billions of dollars in early bonuses even as [Lewis[ was pleading for more bailout cash from Washington to cover Merrill's ballooning losses."

129. Even after the *Financial Times* report, BoA and Merrill steadfastly refused to disclose or confirm the size of the bonuses. As the *Charlotte Observer* reported on January 23, 2009, the BoA still "wouldn't say how much Merrill paid in bonuses," and it was impossible to discern the size of the bonuses from the general compensation and benefits expense in Merrill's financial statements because "[t]hat number includes salaries, bonuses, benefits, retirement payments, commissions for financial advisors and severance for laid-off employees."

130. The news of Merrill's bonus payments immediate triggered an investigation by the New York Attorney General. On January 23, 2009, The New York Times reported that the New York Attorney General's office "is examining the payouts, which a person inside the office characterized... as 'large, secret last-minute bonuses.'" In a subsequent letter to Congress, the New York Attorney General underscored that:

> Merrill Lunch has never before awarded bonuses at such an early date and this timetable allowed Merrill to dole out huge bonuses ahead of their awful fourth quarter earnings announcement and before the planned takeover of Merrill by Bank of America.
>
> Merrill Lynch's decision to secretly and prematurely award approximately $3.6 billion in bonuses, and Bank of America's apparent complicity in it, raise serious and disturbing questions.

131. In response to the disclosure of Merrill's enormous, accelerated bonus payments, BoA stock fell another 15% on heavy trading volume, dropping from a close of $6.68 per share on January 21, 2009 to a close of $5.71 per share on January 22, 2009. All told, BoA common stock fell 56% - from $12.99 per share on January 9, 2009 to $5.71 per share on January 22, 2009 - in response to these belated disclosures, destroying tens of billions of dollars in shareholder value.

44

Similarly, the price of BoA's Preferred Securities fell by over 30% in the aggregate during this same time period.

132.     The fallout from the revelations described above continues to be immense, resulting in additional civil and criminal investigations at both the federal and state levels. In addition to the New York Attorney General's ongoing investigation, a similar investigation was initiated by the Attorney General of North Carolina to determine whether, among other things, Merrill and BoA had violated that state's laws against fraudulent transfers and civil racketeering. Neil Barofsky, the TARP Inspector General, also opened a probe.

133.     Additionally, in January 2009, although it would not be disclosed to shareholders until mid-July 2009, the Federal Reserve and the Office of the Comptroller of the Currency downgraded the overall rating of BoA from "fair" to "satisfactory." A letter sent by Federal Reserve officials explaining the action criticized BoA's management and director for being "overly optimistic" about risk and capital. As the letter explained, "Management has taken on significant risk, perhaps more than anticipated at the time the acquisition was proposed," and, as a result, "more than normal supervisory attention will be required for the foreseeable future." As a result of these conclusions, in early May 2009, federal regulators imposed a "memorandum of understanding" on BoA that, among other things, required it to address its problems with liquidity and risk management.

134.     On February 10, 2009, the New York Attorney General wrote a letter to Congress providing details on Merrill's accelerated bonus payments. The letter detailed how Merrill's accelerated bonus schedule had allowed it to disproportionately reward its top executive despite its massive losses - action which the New York Attorney General described as "nothing short of

45

staggering." In particular, the New York Attorney General described as "nothing short of staggering." In particular, the New York Attorney General stated that:

> While more than 39 thousands Merrill employees received bonuses from the pool, the vast majority of these funds were disproportionately distributed to a small number of individuals. Indeed, Merrill chose to make millionaires out of a select group of 700 employees. Furthermore, as the statistics below make clear, Merrill Lynch awarded an even smaller group top executives what can only be described as gigantic bonuses.

135.    Among the statistics that the New York Attorney General set forth were that (i) "[t]he top four bonus recipients received a combined $121 million;" (ii) "[t]he next four bonus recipients received a combined 462 million;" (iii) "[f]ourteen individuals received bonuses of $10 million or more and combined they received more than $250 million;" and (iv) "[o]verall, the top 149 bonus recipients received a combined $858 million."

136.    On April 29, 2009, at the Company's annual meeting, BoA shareholders voted to strip Lewis of his position as Chairman of the BoA Board in a vote that analysts deemed a rebuke to Lewis's conduct in connection with the merger. *Business Week* reported that the 'vote marked the first time that a company in the Standard & Poor's 500-stock index had been forced by shareholders to strip a CEO of chairman duties." At the shareholder meeting, Lewis conceded that BoA's shareholders "have carried a heavy burden" as a result of the Merrill acquisition.

137.    On May 7, 2009, the U.S. Government revealed results of certain "stress tests" of large banks conducted by the Federal Reserve. BoA was deemed to need an additional $33.9 billion in Tier 1 common capital - far more than any other of the 19 banks tested.

138.    Beginning in May 2009, several member of BoA's Board of Directors resigned, including its lead independent director, O. Temple Sloan, Jr., and Jackie Ward, chairman of the Board's asset quality committee. Other departures included Chief Risk Officer Amy Woods Brinkley,

46

and J. Chandler Martin, an enterprise credit and market risk executive.

139.    In June and July 2009, the Domestic Policy Subcommittee of the Oversight and Government Reform Committee of the House of Representatives held a series of hearing on the merger, with a particular focus on Lewis's failure to disclose either Merrill's mounting losses or his arrangement to receive a Government bailout. During Lewis's testimony on June 11, 0209, Representative Dennis Kucinich told Lewis that, "Our investigation, Mr. Lewis, also finds that Fed Officials believe that you are potentially liable for violating securities laws by withholding material information in your possession from shareholders before the vote to approve the merger with Merrill Lynch on December 5, 2008." Representatives Peter Welch and Elijah Cummins both repeatedly pressed Lewis on the lack of disclosure to shareholders. As Representative Welch put it: "Did you tell your shareholders that you had come upon this information, that the deal they voted on is not the deal that was going through, because they had a $12 billion hole that was accelerating?"

140.    On August 3, 2009, the SEC filed a complaint against BoA in the United States District Court for the Southern District of New York, alleging that BoA had violated Section 14(a) of the Exchange Act by misleading shareholders about the Merrill bonus agreement. That same day, the SEC announced that BoA had agreed to settle the action and pay a $33 million fine.

141.    As the SEC charged in its complaint, although the Proxy had stated that Merrill would not pay year-end bonuses without the BoA's consent, in fact, BoA had already consented to the payments as part of the Merger Agreement:

> The omission of Bank of America's agreement authorizing Merrill to pay discretionary year-end bonuses made the statements to the contrary in the joint proxy statement and its several subsequent amendments materially false and misleading. Bank of America's

47

representations that Merrill was prohibited from making such payments were materially false and misleading because the contractual prohibition on such payments was nullified by the undisclosed contractual provisions expressly permitting them.

142. During the SEC's investigation, Merrill's most senior human resources executive, Peter Stingi (Stingi"), whose responsibilities included monitoring the annual bonus pay of Merrill's competitors, acknowledged that the compensation expense set forth in Merrill's financial statements did not disclose Merrill's bonus plans. Specifically, Stingi testified under oath that:

> We would not be able to see what our competitors' quarterly [bonus] accruals were because they like us would report their compensation and benefits expense [as an aggregate] .... [Y]ou really couldn't make a very exact guess about what the impact on the annual bonus funding was because there are so many other line items that fo into the aggregate expenses.

143. The day after the SEC filed its complaint, Representative Kucinich wrote to Mary Schapiro, Chair of the SEC, to "request that the SEC expand its investigation into possible securities law violations committed by Bank of America in connection with its merger with Merrill Lynch." Representative Kucinich explained that the House of Representatives' Domestic Policy Subcommittee of the Oversight and Government Reform Committee had "reviewed over 10,000 pages of confidential documents obtained from the Federal Reserve" and that "our investigation has revealed ... [t]op staff at the Federal Reserve had concluded that Bank of America knew, as early as mid-November, about a sudden acceleration in the losses at Merrill Lynch, and [Federal Reserve] General Counsel Scott Alvarez believed that Bank of America could potentially be liable for securities laws violation for its failure to update its proxy solicitation and public statements it had made about the merger in light of information Bank of America possessed about Merrill's deterioration before the shareholder vote."

144. On September 8, 2009, the New York Attorney General sent a letter to BoA's outside

48

counsel, which summarized the results of the New York Attorney General's investigation and stated that it was in the process of "making charging decisions with respect to Bank fo America and its executive." The letter provided that, "The facts of [Merrill's] cascading losses and bonus payments - and the facts of Bank of America's senior executives' knowledge of those events - are straightforward." The letter further provided that, "Our investigation has found at least four instances in the fourth quarter of 2008 where Bank of America and its senior officers failed to disclose material non-public information to its shareholders," and did so knowingly, including their failure to disclose (i) at least "$14 billion" of Merrill's "losses prior to shareholder approval of the merger," about which "Bank of America knew;" (ii) "a goodwill charge of more than $2 billion associated with sub-prime related losses," which "was known of by November" 2008 but nevertheless lumped into Merrill's "purportedly "surprising"" losses after the shareholder vote; (iii) Bank of America's determination, "eight business days after the merger was approved, that it had legal basis to terminate the merger because of Merrill's losses," which it reversed only "when the jobs of its officers and directors were threatened by senior federal regulators;" and (iv) Merrill's "accelerated bonus payments," which "were not disclosed in the proxy materials even though they clearly should have been under the circumstances."

145.    On September 14, 2009, the Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, rejected the proposed $33 million settlement of the suit filed by the SEC against BoA. The Court held that the proposed settlement was "neither fair, nor reasonable, nor adequate" because no senior BoA executives were sued or contributed to the settlement. The Court found that the settlement violated the SEC's "normal policy in such situations ... to go after the company executives who were responsible for the lie," and rejected

49

the SEC's contention that it did not have grounds for bringing claims against senior BoA

officials, remarking, "How can such knowledge [of the falsity of the statements in the Proxy] be

lacking when, as the Complaint in effect alleges, executives at the Bank expressly approved

making year-end bonuses before they issued the proxy statement denying such approval?" A trial

date in the SEC action has been set for March 1, 2010.

146.    On September 18, 2009, the *Charlotte Observer* reported that, for the past six months, the

F.B.I. and the U.S. Department of Justice have been conducting an extensive "criminal

investigation" of BoA in connection with the merger. As part of this wide-ranging investigation,

BoA "has provided hundreds of thousands of documents and dozens of hours of executive time"

to answer questions.

147.    That same day, *Bloomberg* reported that, on September 17, 2009, Thain gave a speech at

the Wharton School of the University of Pennsylvania, during which he made it clear that BoA's

claim that it lacked control over the bonuses paid to Merrill executives and employees was not

true:

> [W]hen [BoA] said, "John Thain secretly accelerated theses bonuses," they were lying
> and that has now trapped them into a lot of trouble because there is a piece of paper,
> there's a document that says, yes, they in fact agreed to this in September. So one take
> away for all of you is it's really always better to just tell the truth.

148.    On September 15, 2008, BoA announced that it had agreed to acquire Merrill for $50

billion in an all stock transaction that valued Merrill at $29 per share - a 70% premium to its

closing price on September 12. As part of this agreement, BoA held a conference call for

analysts and investors in which Lewis, Thain, and Price participated (the "Investor Call")

conducted a press conference in which Lewis and Thain participated (the "Press Conference"),

50

and issued a press release. In each instance, BoA, Merrill, Thain, Lewis, and Price made

materially false and misleading statements about circumstances surrounding the merger.

149.    For example, during the Investor Call, several analysts questioned the adequacy of BoA's

due diligence given the extremely abbreviated time frame in which the deal came together. In

response to these queries, Price assured investors that the due diligence performed by BoA and

its financial advisors, J.C. Flowers, had been "extensive":

> [F]rom a risk or due diligence perspective. . . we competed against Merrill Lynch and
> have known them well for years in addition to discussing business opportunities several
> times. We sent in a large team to review areas such as asset valuations, trading positions,
> and the like. We were also joined by a team from J.C. Flowers that had done extensive
> due diligence over some time in reviewing other potential transactions [involving
> Merrill], so they were very familiar with Merrill Lynch's books.

150.    During the Press Conference, Lewis also emphasized that BoA's due diligence was more

than sufficient, and had established that Merrill's risk profile had been "dramatically" reduced in

recent months:

> [H]e and his firm [Chris Flowers and J.C. Flowers] had done quite an amount of due
> diligence on Merrill Lynch fairly recently, and it was very, very extensive. They had
> looked at the marks very comprehensively, so this allowed us to have him and [his] team
> as an advisor, and just update the information they already had. So that was on of the key
> ingredients to being able to do this quickly as we did.

> I will say that Chris's comment was it's night and day from the time we first looked at it
> to now. He was very complimentary of what John and his team had done in terms of
> dramatically reducing the marks, in many cases not only - not reducing the marks but
> getting rid of the assets, which is the best thing to do, so a much lower risk profile than
> he'd seen earlier on.

151.    Lewis further stated that: "The J.C. Flowers piece is key because they were renewing an

effort that had already gone on and had been very, very extensive." Lewis likewise assured BoA

shareholders that BoA was very familiar with Merrill's risk profile because BoA and Merrill

shared "very similar methodology valuations" and "very similar marks." He noted: "The structures - we're dealing with the same counterparties on things. So again, back to the earlier point, we're pretty familiar with the types of assets and feel pretty good about the progress that Merrill Lynch had made itself."

152.    These statements were false because (i) BoA had not "comprehensively" analyzed Merrill's financial condition, and thus (ii) Defendants had no reasonable basis to make any representation about Merrill's risk profile, which was dangerously high and had become much worse, rather than improved. Indeed, after reviewing thousands of Merrill's internal documents which were made available by Merrill to BoA during the due diligence process, federal regulators determined that BoA's due diligence had been grossly deficient because, among other things, it failed to appropriately consider Merrill's risk profile. For example, in the Federal Reserve Merger Analysis, federal regulators concluded that Merrill's "single largest area of risk exposure and driver of recent losses . . . were clearly shown in Merrill Lynch's internal risk management reports that [BoA] reviewed during their due diligence." Further, after Lewis threatened to invoke MAC due to Merrill's mounting losses, senior officials from the Federal Reserve concluded that the balance of Merrill's "risk exposures cited by management . . . should also have been reasonably well understood, particularly as [BoA] itself is also active in ... these products." Thus, these officials concluded that BoA's failure to accurately understand Merrill's exposures at the time of the merger announcement "implies substantial deficiencies in the due diligence carried out in advance of and sudsequent to the acquisition."

153.    Lewis himself acknowledged that BoA's due diligence was grossly inadequate. When Lewis was originally approached Federal Reserve officials for a bailout on December 17, 2008,

52

Chairman Bernanke informed him that, if he were to terminate the merger, it would immediately reveal the falsity of his claims regarding "adequate due diligence." In a December 23, 2008 email, Mac Alfriend, a Senior Vice President at the Federal Reserve ("Alfriend"), wrote to other senior Federal Reserve officials that Lewis "is worried about stockholder lawsuits; knows they did not do a good job of due diligence and issues facing the company are finally hitting home and he [Lewis] is worried about his own job after cutting loose lots of very good people."

154.    As a direct result of BoA's inadequate due diligence, Defendants' statements about Merrill's "dramatically" lower risk profile were made without any reasonable basis. Indeed, mere weeks after Defendants made these statements, in October 2008, Merrill experienced the wort month in its history, incurring $7 billion of losses on high-risk assets that Thain acknowledged "were incurred almost entirely on legacy positions" that Merrill held as of September 15, 2008 "would be catastrophic to Merrill because of the amount of bad assets we had on our balance sheets," and that was precisely "why we sold the company." Moreover, contrary to BoA's representation that Merrill had "dramatically" reduce its risk profile, in its internal Federal Reserve Analysis, Federal Reserve officials concluded that Merrill maintained several "large ... risk exposures" and "vulnerabilities" which exposed it to losses of between $13.4 billion and $23.2 billion. These exposures were so material that Alfriend wrote in an email that "Merrill is really scary and ugly."

155.    Lewis also made false statements about Merrill's liquidity and its ability to survive as an independent entity. For example, in response to questions asked during the Investor Call as to why BoA had agreed to pay such a substantial premium for Merrill, Lewis stated:

    One, probably the more likely is that Merrill had the liquidity and capacity to see this

53

through. It's not necessarily easy because of just the times. But more likely than not, they would have seen this through and come out on the other side.

156.    This statement was false because, as Thain admitted, Merrill did not have the liquidity or capacity to survive as a stand-alone entity. In fact, Thain admitted in sworn deposition testimony before the New York Attorney General that, without a deal, Merrill would have become effectively insolvent "beginning Monday morning," September 15, 2008. As noted above, Thain also subsequently stated that Lehman's bankruptcy filing on September 15 "would be catastrophic to Merrill because of the amount of bad assets we had on out balance sheets," and that Merrill's impending insolvency was "why we sold the company." Furthermore, Thain has publicly acknowledge that he attended a meeting on Friday, September 12, 2008 with the heads of the major investment houses, wherein it was discussed that Merrill's failure was imminent in light of the Lehman bankruptcy.

157.    Defendants also falsely represented that they were under no pressure from Federal regulators to complete the deal quickly. For example, in response to questions from analysts during the Press Conference about whether federal regulators had pressured the parties to get the deal done quickly, Lewis stated that:

> First of all, there was no pressure from regulators. I'm sure, after the fact, that having this not be an issue is obviously very positive to them, but absolutely no pressure.

158.    This statement was false because, during the merger negotiations, Secretary Paulson had issued an ultimatum that BoA and Merrill finalize the transaction by Monday morning, September 15, 2008. As *PBS Frontline* reported, "Paulson was adamant the deal had to be done by Monday morning." In fact, Thain has subsequently admitted that Paulson demanded that the parties finalize the transaction by September 15, as set forth above.

159.    In response to a question concerning whether Lewis and Thain had discussed Thain's position in the combined company, Thain stated that they had not, and Lewis emphasized that Thain had not sought to enrich himself or otherwise pursue his own self-interest while negotiating the merger. Lewis stated: "That's a credit to John. It usually doesn't happen that way and he never - it was never about him; it was always about the deal."

160.    This statement was false because, in reality, the merger negotiations were very much about Thain's ability to pay himself (and his associates) tens of millions of dollars. As we subsequently revealed, Thain had demanded that Lewis pay him a $40 million bonus in connection with this merger, as well as $100 million in bonuses for his top lieutenants and former business associated from Goldman Sachs, as part of the total $5.8 billion in discretionary bonuses to Merrill executive and employees. In fact, rather than focusing on "the deal," Thain stated that Merrill's bonuses were one of the three "main things" he focused on, and he used the merger as an opportunity to materially increase the amount of bonus compensation Merrill was planning to pay him and other executives. Indeed, Thain was so focused on the question of personal compensation that, although the other terms of the agreement had been settled by the night of Sunday, September 14, negotiations concerning the Merrill bonuses continued until the early morning hours of Monday, September 15.

161.    BoA and Merrill also made false and misleading statements about the purported benefits of the merger. For example, during the Investor Call, Lewis emphasized his favorable view of the merger, stating that the merger would "creat[e] more value for shareholders," and that the combined companies would be "just an incredible combination." Similarly, Thain stated: "This is a transaction that makes tremendous strategic sense. We think it gives us great opportunities,

both on the Bank of America side and on the Merrill Lynch side" and "I think this is going to be

a very attractive transaction from a shareholder point of view[.]" During the Press Conference,

Lewis told investors that the merger was "just a major grand slam home run" and "this was the

strategic opportunity of a lifetime . . . . So we are very, very pleased with this."

162.    BoA and Merrill also praised the merger in the press release they issued that day, which

was filed with the SEC as an exhibit to a Form 8-K, stating:

> Bank of America Corporation today announced it has agreed to acquire Merrill Lynch &
> Co., Inc. in a $50 billion all-stock transaction that creates a company unrivalled in its
> breadth of financial services and global reach.

> "Acquiring one of the premier wealth management, capital markets, and advisory
> companies is a great opportunity for our shareholders," Bank of America Chairman and
> Chief Executive Officer Ken Lewis said. "Together, our companies are more valuable
> because of the synergies in our businesses."

> "Merrill Lynch is a great global franchise and I look forward to working with Ken Lewis
> and our senior management to create what will be the lending financial institution in the
> world with the combination of these two firms," said John Thain . . . .

> *    *    *

> Adding Merrill Lynch both enhances current strengths at Bank of America and creates
> new ones, particularly outside of the United States.

163.    These statements praising the benefits of the merger were false and misleading, and made

without reasonable basis. As noted above BoA's due diligence of Merrill was grossly

inadequate, and the amount of toxic assets on Merrill's balance sheet was so substantial that BoA

would not have been able to absorb them had the Government not agreed to a 4138 billion

bailout.

164.    All of the above statements made on September 15 were highly material to investors.

Given Merrill's recent losses, the 70% premium BoA was paying, and the fact that the collapsing

56

housing market was causing turmoil at other financial institutions, the market was concerned over whether BoA had adequately investigated Merrill's exposure to potentially toxic assets, whether Merrill's financial condition was fundamentally sound, and whether regulators had pressured the parties to hastily agree to a deal that was not in BoA's best interests. The market was also concerned about whether Merrill executives had attempted to enrich themselves at the expense of BoA shareholders by draining Merrill of value before the transaction closed.

165.    In response to these statement, on September 15, 2008, Ladenburg Thalman reported that "the fact that Bank of America paid a high premium fro Merrill and would not buy Lehman indicates that the due diligence done on both companies suggests that Merrill may be in a stronger condition than thought." On September 16, 2008, *The Daily Telegraph* of London reported that, "Bank of America was able to carry out due diligence on Merrill's books so swiftly because of work previously carried out by JC Flowers ... which has been studying Merrill closely for months." Likewise, *Investment Dealers' Digest* quoted the managing director at research and advisory firm TowerGroup as concluding, "Don't let them fool you into thinking they haven't been looking at each other for a long time ... This was not a deal that was drummed up in the shower on Sunday morning and completed on Sunday night. These two firms are very familiar with each other."

166.    On September 18, 2009, three days after Defendants announced the proposed merger, BoA and Merrill filed a Form 8-K with the SEC attaching the Merger Agreement. The Merger Agreement assured BoA shareholders and investors that Merrill would not pay discretionary bonuses before the merger closed. Specifically, in a section titled "Company Forbearances," the Merger Agreement provided that, "except as set forth in Section 5.2 of the Company Disclosure

57

Schedule or except as expressly contemplated or permitted by this Agreement," from September 15, 2008 through January 1, 2008, Merrill "shall not, and shall not permit any of its Subsidiaries to, without the prior written consent of [BoA]," undertake any of 18 enumerated actions, including:

> Increase in any manner the compensation or benefits of any of the current or former directors, officers or employees of Company or its Subsidiaries (collectively, "Employees"), [or] pay any amounts to Employees not required by any current plan or agreement (other than base salary in the ordinary course of business).

167.    This statement was materially misleading. First, the statement set forth above represented that Merrill was prohibited from paying discretionary year-end bonuses before the time that the merger closed when, in reality, BoA had already authorized Merrill to pay up to $5.8 billion of discretionary bonus compensation, and to do so on an accelerated schedule, before the merger closed. Second, the statement set forth above falsely reassured investors that BoA has not consented to Merrill's payment of any bonuses before the merger closed when, in fact, BoA had already granted its consent with respect to the payment of $5.8 billion of bonuses. As set forth above, the undisclosed bonus agreement was highly material because, among other reasons, (i) the amount set aside to pay bonuses constituted 12% of the entire merger price and 30% of the Merrill's shareholders' equity; (ii) the accelerated schedule deviated from Merrill's normal bonus schedule; (iii) the agreement meant that Merrill would pay billions of dollars in bonuses despite the fact that it lost more than $21 billion in the fourth quarter; and (iv) the payment of these bonuses before the merger closed ensured that BoA shareholders would receive an asset worth billions of dollars less than contemplated.

168.    The agreement allowing Merrill to pay $5.8 billion of bonuses pursuant to Merrill's VICP

before the merger closed was secretly memorialized in a side agreement called the "Company Disclosure Schedule." While the Merger Agreement made a generalized reference to this Disclosure Schedule, the Disclosure Schedule was not filed with the Merger Agreement, and its contents were never publicly disclosed to shareholders. Defendant's failure to either publicly file the Disclosure Schedule or summarize the contents of the secret bonus agreement in the Merger Agreement independently rendered the September 18, 2008 Forms 8-K materially false and misleading because they violated Item 601(b)(2) of Regulation S-K. Items 601(b)(2) requires that schedules to a "plan of acquisition" must be filed with the SEC if they "contain information which is material to an investment decision and which is not otherwise disclosed in the agreement." In addition, Item 601(b)(2) further provides that any plan of acquisition "shall contain a list briefly identifying the contents of all omitted schedule to the Commission upon request." Accordingly, Defendants' failure to publicly file the Disclosure Schedule or summarize its contents in the Merger Agreement also rendered the September 18, 2008 Forms 8-K materially false and misleading.

169. On October 6, 2008, BoA announced that it was conducting the Secondary Offering for approximately $10 billion. During a conference call that day, Price told investors that the Secondary Offering was sufficient to cover BoA's capital needs required by the Merrill transaction, stating that BoA had "considered the Merrill deal" in assessing its capital position, and that the offering "covered our anticipated needs from a Merrill standpoint."

170. The Secondary Offering was conducted pursuant to BoA's Form S-3ASR Shelf Registration Statement dated May 5, 2006, and the Prospectus Supplement filed with the SEC on October 9, 2008 on Form 424(b)(5) (defined above collectively as the "Offering Documents").

59

171. The Offering Documents expressly incorporated by reference BoA's Form 8-K filed with the SEC on September 15, 2008, and Form 8-K filed with the SEC on September 18, 2008. As set forth above, these documents contained untrue statements of material facts and omitted to state material facts, thereby rendering the Offering Documents materially false and misleading.

172. On October 16, 2008, Merrill issued a press release announcing its financial results for the third quarter, including a net loss of $5.2 billion. Significantly, in the press release, Merrill explained that this $5.2 billion loss was a positive development, and highlighted that the loss was caused by the aggressive selling of risky assets in order to strengthen Merrill's balance sheet before the merger with BoA. Thain misleadingly proclaimed that Merrill "continue[d] to reduce exposures and de-leverage the balance sheet prior to the closing of the Bank of America deal," and that, as a direct result, "we believe even more that the transaction will create an unparalleled global company with pre-eminent ... earnings power."

173. In response to Merrill's announcement, analysts concluded that Merrill had significantly improved its financial condition in preparation for the merger with BoA, and believed that Merrill would make a profit in the fourth quarter. For example, in an October 16, 2008 analyst report on Merrill, Credit Suisse noted: "The strongest positive in the quarter was the progress made on working down the investment bank's 'high risk' inventory ... With these write-downs and several billion in sales, detailed exposures were reduced by 20% quarter to quarter [and] the high risk positions came down an even more substantial 39%." That same day, Deutsche Bank reported, "Merrill's quarter reflects, in our view, a clean-up prior to its year-end merger with Bank of America." The report forecasted earnings of $0.54 per share for the fourth quarter. On October 17, 2008, Buckingham Research Group reported that Merrill had "aggressively reduced

60

its exposure to high risk assets" and that only $1.5 billion of risky assets remained vulnerable to write downs in the fourth quarter. Indeed, on October 17, Thomas First Call consensus estimates stated that Merrill would have positive earning of $0.44 per share in the fourth quarter.

Likewise, on October 19, 2008, Oppenheimer concluded the Merrill "reported a 'clear the decks' style quarter with the major theme of de-risking the balance sheet ... ahead of the pending merger with Bank of America."

174.    However, the statements in Merrill's October 16, 2008 press release were materially false and misleading. The statement that Merrill was continuing to "reduce exposures and de-leverage the balance sheet" was materially false and misleading because, notwithstanding its purported efforts to "reduce exposures" and "de-leverage the balance sheet," Merrill retained large amounts of toxic assets on its balance sheet that caused $7 billion of losses in October alone and losses of more than $21 billion in the fourth quarter.

175.    On October 2, 2008, BoA filed a preliminary version of the Proxy with SEC on Form S-4, and later filed two amendments on Forms S-4/A on October 22 and October 29, 2008. On November 3, 2008, BoA and Merrill filed the definitive Proxy, including the attached Merger Agreement, with the SEC on Firm DEFM14A and as a prospectus supplement to the Proxy Registration Statement on Form 424(b)(3), and mailed it to shareholders.

176.    The Proxy which included a cover letter signed by Lewis and Thain, explained the terms and conditions of the merger to shareholders, informed them about the background of the merger, and set forth the reasons why the BoA and Merrill Boards recommended that the shareholders vote in favor of the merger. The Proxy also informed BoA and Merrill shareholders that the shareholder vote on the merger would occur on December 5, 2008.

177. The Proxy was materially false and misleading at the time it was filed because it failed to disclose any information whatsoever about Merrill's October 2008 losses. At the time the Proxy was filed on November 3, 2008, Merrill had sustained more than $7 billion in losses in October alone-a highly material amount which Defendants were required to disclose.

178. Moreover, as Merrill's losses increased, Defendants were under a duty to update the Proxy to correct any of the false and misleading statements or omissions they had previously made, and to update any statements or omissions that had become false or misleading as a result of intervening events. Defendants also had a duty to correct and/or update the Proxy as a result of intervening events, as well as a duty to correct and/or update under Rule 14a-9, which required Defendants to update in proxy supplements "any statement in any earlier communication with respect to the solicitation of the proxy ... which has become materially false or misleading."

179. As set forth more fully above, by mid-November 2008, Merrill's losses had increased to at least $9 billion and were rapidly accelerating. By the end of November, Merrill has suffered another $4 billion in losses as well as a goodwill impairment of more than $2 billion. Thus, by the beginning of December 2008 - just days before the shareholder vote on the merger - Merrill had already suffered an astounding $15.3 billion in total losses and impairments in October and November 2008, with billions of dollars of additional losses projected for December.

180. In violation of their duty to update and/or correct the Proxy and their earlier statements soliciting shareholder approval of the merger, Defendants never disclosed Merrill's massive losses at any time before the shareholder vote. There losses were highly material. Specifically, Merrill's $15.3 billion pretax loss for October and November 2008 substantially exceeded Merrill's pretax loss from continuing operations of $12.8 billion for all of 207 - the worst year in

62

its history. In fact, these losses were so material that, beginning on November 20 - weeks before the vote - BoA executives debated internally about terminating the merger by invoking the MAC. The failure to disclose the losses Merrill suffered in October and November 2008 prior to the shareholder vote rendered the Proxy materially false and misleading.

181. In addition, the failure to disclose Merrill's losses rendered several statements in the Proxy materially false and misleading. For instance, the Proxy stated that there was an "absence of material adverse changes" in Merrill's financial condition. Similarly, the Merger Agreement, which was attached to the Proxy as Appendix A, made the same representation until the close of the merger. These statements were materially false and misleading because, contrary to these assurances, Merrill had suffered material adverse changes to its financial condition. As noted above, Merrill had suffered more than $15 billion of losses before the vote, with billions of dollars of additional losses projected for December. Senior BoA executives, including Lewis and Price, repeatedly debated terminating the merger by invoking the MAC before the vote and immediately following the vote, Lewis acknowledged that a material adverse change in Merrill's financial condition had occurred and that BoA planned to invoke MAC.

182. Similarly, the Proxy falsely represented that no "material adverse change" had occurred in BoA's financial condition and that BoA had a "strong capital position, funding capabilities and liquidity." In reality, however, by the end of November, BoA was projecting its own quarterly loss of at least $1.4 billion - the first quarterly loss in its history and a material fact. Further, in December 2008, senior Federal Reserve officials, who had closely examined and analyzed BoA's capital position, concluded that BoA's own capital levels were "very thin" and that BoA was "clearly" not able to withstand further deterioration, which would result directly from the Merrill

transaction.

183.    Further, despite these undisclosed, mounting losses at both firms, the Proxy falsely

portrayed the financial condition of the combined company as strong. Specifically, the Proxy

falsely stated that one of the principal reasons for the merger was the "strong capital position,

funding capabilities and liquidity" the combined company would have. The representation about

the combined company's "strong" financial condition was materially false and misleading for the

reasons set forth herein.

184.    The Proxy was also materially false and misleading because it failed to disclose that BOA

has agreed to allow Merrill to pay up to $5.8 billion in bonuses before the merger closed. As

noted above, this secret bonus agreement was highly material. Indeed, as Merrill's losses

increased to $15.3 billion before the shareholder vote, the undisclosed bonus agreement became

even more material because it permitted the payment of billion in bonuses to Merrill's executives

and employees despite the fact that Merrill's losses, and their impact on BoA were catastrophic.

185.    In fact, rather than disclose this secret agreement, the Proxy falsely represented to

investors that, as part of the merger, Merrill "will not" pay any discretionary bonuses.

Specifically, the Proxy stated that, subject to "certain exceptions" which were unspecified, or

unless it had BoA's "prior written consent," Merrill "will not . . . undertake the following [18]

extraordinary actions," including:

    (i) increase the compensation or benefits of any current or former directors, officers or

    employees; (ii) pay any current or former directors, officers or employees any amounts

    not required by existing plans or agreements; (iii) become a party to, establish, adjust, or

    terminate any employee benefit or compensation plan or agreement...

186.    The Proxy further stated that BOA's "written consent" will not be unreasonably withheld or delayed," falsely indicating that no such consent had been given.

187.    Similarly, the Merger Agreement attached to the Proxy assured investors that Merrill "shall not" make any discretionary bonus payments in language identical to that set forth in the agreement attached to the September 18, 2008 Form 8-K, reproduced above.

188.    The statements in the Proxy and the Merger Agreement set forth above were materially false and misleading for the reasons set forth above.

189.    In addition, the Proxy incorporated Merrill's March 2008 Proxy, which made other false statements about the bonus awards, including that (i) Merrill's "annual incentive compensation (annual bonus)" for executive officers is "paid in January for performance in the prior fiscal year;" (ii) "[t]he goal of our compensation programs is to provide an integral link between ay and performance and enhance returns to shareholders; (iii) Merrill's bonus policy "provide[s] a strong incentive to increase financial performance and enhance returns to shareholders;" (iv) Merrill's "pay for performance" policy "fosters an ownership culture that increases executive focus on Company-wide returns across economic and business cycles;" and (v) Merrill's "pay for performance" policy focused on "the performance of the Company as a whole," and was emphasized as "the core of our compensation policy."

190.    Defendants' statements set forth above were false. Directly contrary to the statement that Merrill paid bonuses "in January for performances in the prior fiscal year," Merrill, BOA, Thain, and Lewis had already agreed to allow Merrill to pay up to $5.8 billion of bonuses in December, before the merger closed. Moreover, directly contrary to the statements that Merrill's bonus practice and policy was to "pay for performance" in order to "enhance returns to shareholders,"

65

the secret bonus agreement, including the accelerated schedule, allowed Merrill to pay billions of dollars in bonuses regardless of Merrill's massive fourth quarter and year-end losses and their effect on shareholders.

191.     As noted above, Defendants were under a continuing duty to update and correct the Proxy to disclose the material adverse facts set forth above, including the secret bonus agreement and Merrill's massive losses. On November 21, 2008, BoA and Merrill filed a Proxy Supplement without disclosing any of these facts, and without correcting or updating any of their prior false and misleading statements. Similarly, on November 26, 2008, as BoA executives were debating invoking the MAC, BoA filed another Proxy Supplement, attaching a letter from Lewis, which also failed to disclose any of these facts and did not correct or update any of BoA's or Lewis's false and misleading statements. By failing to do so, these Proxy Supplements falsely affirmed that nothing in BoA's earlier proxy solicitations was, or had become, materially false or misleading.

192.     In addition to being materially false and misleading due to the failure to correct and/or updated Defendants' prior proxy solicitations, the November 26, 2008 Proxy Supplement contained materially false statements. Indeed, BoA's November 26, 2008 Proxy Supplement consisted of a letter signed by Lewis titled "Despite Stock Price Volatility, Bank of America Remains Strong." In this letter, Lewis recognized that investors were "concerned, among other things, about whether financial institutions have enough capital." To assuage this concern, and with specific stated purpose of bolstering BoA's stock price, Lewis highlighted BoA's purported financial strength:

   I usually don't comment on our stock price. . . But in this environment, I think it is

66

important to share my perspective with associates regarding our stock's volatility, and
how Bank of America is positioned to ride out this severe economic storm.

* * *

Bank of America continues to be a strong, active player in the financial markets. We are
generating strong deposit growth and attracting new customer and client relationships
throughout our company. We continue to make loans to consumers and businesses to
boost shareholder value and to do what we can to support economic activity.

We are one of the most liquid banks in the world. We successfully raised capital in
October and now have Tier I capital that exceeds both regulatory requirements and own
target. In short, we believe we are one of the strongest and most stable major banks in the
world.

Regarding the federal capital injection, these were funds that we did not need and did not
seek. At the time the government asked the major banks to accept the injections, we had
just completed our own $10 billion capital raise in the market and, as I mentioned above,
had more than adequate capital. We accepted the funds from the government as part of
broad plan to stabilize the financial markets generally . . .

193.    The statements that BoA was "one of the strongest and most stable major banks in the

world" and possessed "more than adequate capital" and that BoA "did not need" the federal

funds were materially false and misleading because, in reality, as senior Federal Reserve officials

concluded, (i) BoA was "very thinly capitalized," and was "clearly not [] well prepared for any

further deterioration;" and (ii) by the end of November 2008, BoA had suffered almost $800

million in loss in its history - thus further eroding its capital levels, as set forth above.

194.    Further the statements in November 26, 2008 Proxy Supplemental were materially false

and misleading because the imminent acquisition of Merrill would devastate BoA's Tier 1 capital

levels and liquidity position. Indeed, as BoA knew, Merrill had already suffered approximately

$15.3 billion in total losses and, as Congress's expert analysis concluded, Merrill's internal loss

data provided strong evidence that these losses were significantly accelerating. Lewis

67

acknowledged that these losses were enough to bring BoA to the brink of insolvency when he determined to invoke the MAC mere weeks after issuing the November 26, 2008 Proxy supplement, and conceded that BoA not absorb these losses without massive taxpayer assistance.

195. On December 5, 2008, BOA shareholders convened in Charlotte, North Carolina and voted to approve the merger. Rather than disclosing any of the material facts regarding Merrill's or BOA's losses, or the bonuses to be paid to Merrill's executives and employees, Lewis stated that the merger "puts us in a completely different league."

196. Later that day, BoA issued a press release that quoted Lewis as stating: "When this transaction closes, Bank of America will have the premier financial services franchise anchored by the cornerstone relationship products and services of deposits, credit and debit cards, mortgages and wealth management."

197. This press release and Lewis's remarks at the shareholder meeting were materially false and misleading because they did not disclose any of the material adverse facts set forth above, including that (i) Merrill had already suffered at least $15.3 billion in losses and impairments in October and November, with billions more expected in December; (ii) BoA had already suffered almost $800 million in losses and was expecting a $1.4 billion quarterly loss; (iii) BoA, as senior Federal Reserve officials determined, was "very thinly capitalized," and was "clearly not [] well prepared" for further deterioration; and (iv) BoA lacked the capital to absorb Merrill's losses without massive amounts of Government aid. Indeed, Lewis acknowledged that BoA lacked the capital to absorb Merrill's losses when, mere days after issuing the statements set forth above, he decided to terminate the merger or, alternatively, seek a $138 billion taxpayer bailout to rescue BoA from collapse. Similarly, the statement that the merger would create "the premier financial

68

services franchise" was materially false and misleading for the same reasons.

198.    As alleged above, following the December 5, 2008 shareholder vote and prior to close of the merger on January 1, 2009, numerous highly material events occurred that BoA failed to disclose:

- Days after the shareholder vote, Lewis determined - an informed Secretary Paulson and Chairman Berrnanke - that Merrill's losses were so large that BOA could not absorb them, and that, as a result, BoA had determined to terminate the merger by invoking the MAC.

- Secretary Paulson threatened to fire Lewis, BoA's senior management, and the BoA Board if they refused to complete the merger, and as a result Lewis and BoA's officers faced an irreconcilable conflict in agreeing to proceed with the merger.

- BoA requested and received a highly dilutive $138 billion taxpayer bailout in order to enable BoA to absorb Merrill's losses.

- BoA suffered a loss of $1.8 billion for the quarter, the first loss in its history.

- On December 31, as Merrill's losses for the fourth quarter reached $12.5 billion, Merrill paid out the cash component of the $3.6 billion in bonuses, with BoA's knowledge and approval.

199.    None of these were disclosed in advance of the merger closing date. Instead, on the day the merger closed, BoA issued a press release announcing that "Bank of America Corporation today completed its purchase of Merrill Lynch & Co. Inc. creating a premier financial services franchise with significantly enhanced wealth management, investment banking and international

69

capabilities." The press release quoted Lewis as stating, "We are now uniquely positioned to win market share and expand out leadership position in markets around the world." This press release was materially false and misleading because it omitted to disclose any of the critical developments set forth above, and instead represented that the combined company was a "premier financial services franchise."

200. As alleged above, numerous facts give rise to the strong inference that Defendants BoA and Merrill knew or recklessly disregarded that their statements set forth above were materially false and misleading when made.

201. *First*, the senior executives of both BoA and Merrill possessed direct knowledge of Merrill's losses as they occurred, yet failed to disclose them. As noted above, immediately after the merger was announced, BoA installed 200 people at Merrill, including a large financial team, to monitor Merrill's financial condition and installed Cotty to act as Merrill's CFO. Further as set forth more fully above, Thain issued a memo on January 26, 2009 stating that Merrill's senior executives tracked Merrill's losses on a daily basis, and provided senior BoA executives with this information, also on a daily basis. In particular, Thain stated that BoA's senior executives had "daily access to our p&l [profit and loss statements], our positions and our marks." Moreover, during Thain's *PBS Frontline* interview, he explained in greater detail that both he and Merrill's senior executives, as well as BoA and its senior executives, received daily, "step-by-step" updates on Merrill's financial condition.

202. Given the facts set forth above, a BoA spokesperson told *The New York Times* that "we have not disputed that we were kept informed about the financial condition of the company." Indeed, knowledge of Merrill's losses was so well-known among BoA's senior executives that -

70

as newspaper reports and the New York Attorney General's investigation have established -

between November 20 and December 3, 2008, BoA's senior executives repeatedly discussed

terminating the merger pursuant to the MAC and informing shareholders of Merrill's mounting

losses, as described more fully above.

203.     *Second*, BoA's and Merrill's senior executives also knew of the \$2 billion goodwill

impairment by November 2008 - yet represented to regulators that it arose suddenly after the

shareholder vote. As the New York Attorney General wrote in his September 8, 2009 letter,

"Even though it was known of by November, this write-down became part of the purportedly

'surprising' losses that were included in Merrill's financials more than a month after the

December 5 shareholder vote." Defendants' knowledge of this write-down before the

shareholder vote - and their false claims of "surprise" as to its existence - further supports an

inference of scienter.

204.     *Third*, Defendants knew or were reckless in now knowing that BoA did not

"comprehensively" analyze Merrill's financial condition, providing them with no reasonable

basis to represent that Merrill's risk profile had improved without also disclosing that it remained

dangerously high, or to make related representations about the expected benefits of the merger.

For example, after reviewing thousands of Merrill's internal documents which were made

available to BoA during the due diligence process, Federal Reserve officials concluded that

BoA's investigation was grossly inadequate, and not performed "comprehensively" as Lewis and

Price represented to investors.

205.     *Fourth*, directly contrary to the statement that BoA had a "strong capital position, funding

capabilities, and liquidity," Defendants knew that, even on a stand-alone basis BoA's own capital

71

position was extremely weak. In a December 19, 20008 e-mail, Tim Clark, a Senior Advisor at the Federal Reserve, wrote that, "<u>as they [BoA senior executives] themselves noted</u> the other night at our meeting, <u>even on a stand alone basis, the firm is very thinly capitalized</u>."

206.    *Fifth,* as set forth above, Defendants were clearly aware of the secret bonus agreement because (i) it was the focus of intense discussions during the merger negotiations and was one of the three "main" terms of the merger agreement (ii) Lewis and Thain, who negotiated the bonus agreement through high-ranking intermediaries, have admitted their knowledge of the bonus agreement; and (iii) executives at each company played an active role in determining and/or approving the ultimate bonus amounts and specific payment dates at various points throughout the fourth quarter. Moreover, Defendants were clearly aware that the bonus agreement had not been disclosed because the bonus agreement was set forth in a separate document that was meant to be, and in fact was, withheld from the investing public.

207.    For purposes of the Exchange Act claims alleged herein, Defendants' unlawful conduct alleged herein directly caused the losses suffered by Plaintiffs and other shareholders. The prices of BoA common stock and Preferred Securities were artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions. The false and misleading statements and omissions set forth above were widely disseminated to the securities markets, investment analysts, and the investing public. The true facts became known by investors and the market through a series of partial corrective disclosures. By making contemporaneous additional misstatements in connection with these partial disclosures or by failing to reveal the falsity of all statements at one time, artificial inflation remained in BoA common stock.

208.    As the true facts became known and/or the materialization of the risks that had been

72

fraudulently concealed by Defendants occurred, the price of BoA common stock and the Preferred Securities declined as the artificial inflation was removed from the market price of the securities, causing substantial damage to Plaintiffs and other shareholders.

209. On January 12, 2009, a Citigroup analyst wrote that BoA might post a $3.6 billion fourth quarter loss and slash its quarterly dividend from $0.32 to $0.05 cents per share. After the report, shares of Bank of America stock fell 12% on heavy volume, falling from $12.99 at the close of market to the prior trading day to $11.43.

210. On January 14, 2008 in Australia, which was January 13 in New York, Merrill executives in Australia warned a bond trader of imminent "awful" news, and admitted that "[t]he market is expecting Merrill Lynch in New York to come out with a bad result on Thursday night." BoA shares dropped 11% from a close of $11.3 on January 12 to close of $10.02 on January 14, on a heavy volume.

211. Further disclosures occurred on January 15, 2009, when *The Wall Street Journal* reported on BoA's imminent TARP injection, prompting BoA shares to drop 18% on extremely heavy volume of 552,669, 186 shares, leaving BoA shares to close at $8.32, an 18-year low. And on January 16, 2009, BoA announced its terrible fourth quarter results, revealing, among other things, the $21.5 billion losses at Merrill and the fact that TARP funding had been necessary to complete the merger. These disclosures caused BoA stock to drop an additional 13% on January 16 on extremely heavy volume.

212. After the close of the markets on January 16, 2009, it was reported that Moody's had downgraded BoA's credit rating due to "the disclosure of substantial losses of Merrill Lynch" and Fitch had downgraded Merrill's individual rating to "F" - well below junk status- due to its

73

"massive losses" and its inability to "survive absent assistance provided by the U.S. Treasury."

213.    On Saturday, January 17, 2009, *The New York Times* reported that, given Merrill's "devastating" losses, BoA's management had sought the bailout not only because of Merrill's losses, but also because of BoA's own precarious financial condition. According to an analyst quoted in *The Wall Street Journal* article, Lewis "has very little credibility with the investor public right now." On Tuesday, January 20, the next trading day, BoA's stock fell an additional 29%, also on extremely heavy volume, as a result of these disclosures.

214.    Finally, BoA stock dropped another 15% on January 22, 2009, the trading day immediately following the *Financial Times* story revealing the accelerated bonus payments.

215.    From January 12, 2008 through January 22, 2008, the corrective disclosures set forth above had a similarly negative effect on the price of the Preferred Securities. The price of the Preferred Securities fell, on average, 32% over this period. Their cumulative negative returns from January 12, 2008 through and including January 22, 2008 are set forth in Appendix A.

216.    Each of the above referenced disclosures partially corrected the false and misleading information previously made available to the market by Defendants' wrongful course of conduct.

217.    For the purpose of the Exchange Act Claims, it was entirely foreseeable to BoA and Merrill that concealing from investors (i) the circumstances surrounding the merger negotiations (including the lack of due diligence and the pressure from federal regulators), (ii) Merrill's losses, (iii) BoA's debating of and decision to invoke the MAC, (iv) BoA's own deterioration financial condition, (v) the taxpayer bailout, and (vi) the secret agreement allowing Merrill to pay up to $5.8 billion in bonuses before the merger closed, would artificially inflate the price of BoA common stock and the Preferred Securities. It was similarly foreseeable that the ultimate

74

disclosure of this information and, in particular, the truth about Merrill's financial condition,

BoA's financial condition, the bonus payments, and circumstances surrounding the merger

negotiations, would cause the price of BoA's securities to drop significantly as the inflation

caused by earlier misstatements was removed from the stock by the corrective disclosures set

forth herein.

218.    Accordingly, the conduct of Defendants as alleged herein proximately caused foreseeable

losses under the Exchange Act to Plaintiffs.

219.    At all relevant times, the market for BoA's common stock was an efficient market for the

following reasons, among others:

        a.    The company's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

        b.    The average weekly trading volume for BoA common stock as a percentage of BoA's outstanding shares, was 13.1% shares during the period of the related Class Action;

        c.    BoA's securities, including its Preferred Securities, were rated by Moody's and Fitch Ratings;

        d.    BoA as extensively followed by numerous securities analysts employed by the firms including J.P. Morgan, Citigroup, Deutsche Bank, Landenburg Thalman, Oppenheimer and NAB Research, among others, who wrote reports about the Company and the value of its securities that entered the public marketplace;

        e.    BoA met the SEC's requirements to register debt and equity securities filed on Form S-3 and, in fact, filed a Form S-3 in connection with the Secondary Offering, among other SEC filings, as set forth above;

        f.    As a regulated issuer, the Company filed periodic public reports with the SEC; and

        g.    BoA communicated with public investors via established market

> communication mechanisms, including the regular issuance of press releases through the *Business Wire* news service, and conference calls with analysts and investors.

220.    As a result, the market for BoA's common stock and Preferred Securities promptly digested current information with respect to BoA from all publicly-available sources and reflected such information in the price of the Company's common stock and Preferred Securities. Under these circumstances, all purchasers of the Company's publicly-traded common stock suffered similar injury through their purchase of the publicly traded common stock of BoA at artificially inflated prices, and a presumption of reliance applies.

221.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint.

222.    None of the statements complained of herein were forward-looking statements. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about the due diligence performed in connection with the merger, the pressure exerted and by federal regulators, Merrill's and BoA's then-existing financial condition, and the payment of accelerated, discretionary bonuses to Merrill's executives and employees.

223.    To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth in detail, then-existing facts contradicted Defendants' statements regarding the due diligence performed in connection with the merger, the pressure exerted by

76

federal regulators, Merrill's and BoA's financial condition, and the payments of accelerated discretionary bonuses to Merrill's executives and employees. Given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by BoA or Merrill were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

224.    To the extent that the statutory safe harbor may apply to any of these false statements alleged herein, Defendants are liable for those false forward-looking statements because of the time each of those statements was made, the speaker actually knew the statement was false, or the statement was authorized and/or approved by an executive officer of BoA who actually knew that the statement was false.

**COUNT I**
**VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5**
**(All Defendants)**

225.    Plaintiffs incorporate the foregoing paragraphs as though set forth fully herein.

226.    Bank of America and Merrill Lynch disseminated or approved the false statements set forth and summarized above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

227.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devises, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts practices, and a course of business that operated as a fraud or deceit upon Plaintiffs in connection

77

with Plaintiffs' purchase of BoA common stock. As detailed herein, the misrepresentations contained in, or the material facts omitted from, Defendants' public statements included, but were not limited to, false and misleading representations and omissions regarding Merrill's and BoA's financial condition and losses, the agreement authorizing Merrill to pay up to $5.8 billion in bonuses before the merger closed, the degree of due diligence performed in advance of the merger, and the reasons for the merger.

228. Defendants, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs; made various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements with knowledge or reckless disregard for the truth; and employed devices, schemes and artifices to defraud in connection with the purchase or sale of securities, which were intended to , and did: (i) deceived the investing public, including Plaintiffs, regarding, among other things, the events that had materially adverse effects on Merrill's and BoA's financial condition and the undisclosed agreement to allow Merrill to pay billions of dollars in bonus compensation prior to the merger; (ii) artificially inflate and maintain the market price of BoA common stock; and (iii) cause Plaintiffs to purchase BoA common stock at artificially inflated prices.

229. As described above, Defendants had a duty to disclose Merrill's highly material losses and the secret bonus agreement when the Proxy was filed, before the shareholder vote, and before the merger closed. Defendants also had a duty to disclose the secret bonus agreement at the time they filed the Merger Agreement.

78

230. Defendants also had a duty to disclose this information because they were required to update and/or correct their prior misstatements and omissions. For example, Defendants repeatedly misrepresented that the merger would be beneficial to BoA shareholders, and misrepresented in the Proxy and the attached Merger Agreement that no material adverse events had occurred. Defendants remained under a duty to update and correct these and their other misrepresentations. Further, by continuing to speak about the merger in supplements to the Proxy, Defendants were under a duty to correct and update prior misstatements and statements that had become misleading, and to speak completely and truthfully about the merger. Defendants also had a duty to disclose known trends affecting liquidity, income, and revenues in the Proxy, and in supplements to the Proxy, including the losses at both BoA and Merrill. Defendants were also under a duty to disclose infrequent or unusual changes and events affecting income in the Proxy and in supplements to the Proxy.

231. Similarly, these Defendants were also required to disclose, before the merger closed on January 1, 2009, the events which occurred in December 2008, as set forth above, because such facts were highly material information and because they were under a continuing obligation and duty to correct and/or update their prior statements concerning the merger, including the statements made on September 15, 2008 and in the Proxy, each of which had clearly been rendered materially misleading by the events that occurred in December 2008.

232. Defendants are liable for all materially false and misleading statements made as alleged above, including, without limitation, the false and misleading statements and omissions set forth above which appeared in (i) the September 15, 2008 Press Release, Investor Call, and Press Conference, (ii) BoA's September 18, 2008 Form 8-K; (iii) BoA's October 6, 2008 conference

79

call; (iv) the Proxy; (v) BoA's November 21, 2008 Form 8-K, which supplemented the Proxy; (vi) BoA's November 26, 2008 Proxy Supplement; (vii) Lewis's December 5, 2008 statement; (viii) BoA's December 5, 2008 Press Release; and (ix) BoA's January 1, 2009 Press Release. These statements were materially false and misleading because, among other things, they misrepresented the conditions under which the Merger Agreement was reached, the terms of the Merger Agreement, and the financial conditions of Merrill and BoA, and they failed to disclose Merrill's losses and the secret bonus agreement. They also failed to correct and update prior misrepresentations or statements that had become misleading by intervening events.

233.    As described above, Defendants acted with scienter, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them. Specifically, Defendants knew or should have known, *inter alia*, that government officials had pressured the parties into announcing a Merger Agreement on September 15, 2008; that the financial conditions of BoA and Merrill were severely deteriorating throughout the fourth quarter of 2008; that the Merger Agreement had been reached without adequate due diligence, and that the Merger Agreement included an undisclosed side agreement to allow Merrill to pay up to $5.8 billion in bonuses before the merger occurred.

234.    Defendants engaged in this scheme in order to maintain and/or inflate the prices of BoA common stock and induce BoA's shareholders to support the merger.

235.    Plaintiffs have suffered damages in that, in direct reliance on the integrity of the market, Plaintiffs paid artificially inflated prices for BoA common stock. Plaintiffs would not have purchased or otherwise acquired BoA common stock at the prices Plaintiffs paid, or at all, if

80

Plaintiffs had been aware that the market price had been artificially and falsely inflated by Defendants' materially false and misleading statements and/or omissions of material facts.

236.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages.

**COUNT II**
**VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT**
**(All Defendants)**

237.    Plaintiffs incorporate the foregoing paragraphs as though set forth fully herein.

238.    The Proxy, documents attached thereto and/or incorporated by reference therein, and other solicitations described above contained misstatements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading.

239.    Defendants did not update the solicitations, or the Proxy, when material information arose after dissemination of these documents, but before the shareholder vote on December 5, 2008.

240.    Defendants jointly and severally solicited and/or permitted use of their names in solicitations contained in the Proxy.

241.    Defendants are issuers of the Proxy.

242.    Defendants permitted the use of their names in the Proxy by allowing the Proxy to represent, among other things, that neither company had experienced material adverse effects, and that Merrill would not pay discretionary bonus compensation.

243.    By means of the Proxy and other documents attached thereto or incorporated by reference therein, Defendants sought to secure Plaintiffs' approval of the merger, and solicited proxies from Plaintiffs and other shareholders.

81

244.   Defendants acted negligently in making false and misleading statements of material facts, omitting material facts required to be stated in order to make statements contained therein not misleading, and failing to update their statements, which were false at the time they were issued and were also rendered false and misleading by material information which arose after the dissemination of those states and before the December 5, 2008 shareholder vote.

245.   The solicitations described herein were essential links in the accomplishment of the merger.  As a result of these solicitations, the BoA shareholders approved the merger.

246.   Plaintiffs were denied the opportunity to make an informed decision in voting on the merger and was damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

247.   By reason of the foregoing, Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. 240.14a-9.

**COUNT III**
**VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT**
**(Bank of America Corporation)**

248.   Plaintiffs incorporate the foregoing paragraphs as though set forth fully herein.

249.   The Secondary Offering Registration Statement contained untrue statements of material facts and omitted material facts required to be stated in order for the statements contained therein to not be misleading.

250.   BoA is the issuer of the common stock pursuant to the Secondary Offering Registration Statement.  As the issuer of the common stock, BoA is strictly liable for the materially false and misleading statements and omissions of the Registration Statement.

251.   Plaintiffs purchased common stock pursuant to the Secondary Offering Registration

82

Statement.

252.   Plaintiffs purchased common stock in the Secondary Offering pursuant to the materially false and misleading Secondary Offering Registration Statement and did not know, and could not have known through reasonable diligence, of the false statements and omissions.

253.   Plaintiffs suffered substantial damages as a direct and proximate result of the false and misleading statements and omissions in the Secondary Offering Registration Statement.

**COUNT IV**
**VIOLATIONS OF SECTION 12(a)(2) OF THE SECURITIES ACT**
**(Bank of America Corporation)**

254.   Plaintiffs incorporate the foregoing paragraphs as though set forth fully herein.

255.   BoA was a seller, offeror, and/or solicitor of sales of the common stock offered pursuant to the Secondary Offering Registration Statement, which contained untrue statements of material fact or omitted to state material facts necessary in order to make statements contained therein not misleading.

256.   Plaintiffs purchased BoA common stock pursuant to the Secondary Offering and did not know, and could not have known with reasonable diligence, of the false statements and omissions contained therein.

257.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages.

**COUNT V**
**NEGLIGENCE**
**(All Defendants)**

258.   Plaintiffs incorporate the foregoing paragraphs as though set forth fully herein.

259.   Defendants owed Plaintiffs and other shareholders a duty of care that required Defendants

83

to act in accordance with industry standards and regulations. The industry standard of care is set forth by the SEC rules and common law.

260. Defendants were negligent based on the allegations set forth herein, which included: (i) failing to act reasonably and in good faith when making public disclosures; (ii) failing to disclose information necessary in order to make Defendants' disclosures not misleading; (iii) failing to comply with industry rules and regulations; (iv) failing to perform adequate due diligence; and (v) making material misrepresentations of material fact.

261. Plaintiffs reasonably relied upon Defendants representations when deciding whether to buy, hold, or sell Bank of America common stock.

262. As a direct and proximate cause of Defendants' negligence, Plaintiffs have suffered damages.

## COUNT VI
## INTENTIONAL MISREPRESENTATION
### (All Defendants)

263. Plaintiffs incorporate the foregoing paragraphs as though set forth fully herein.

264. As set forth above, Defendants made multiple false representations of material fact concerning the viability of BoA and Merrill.

265. Defendants knew that such representations were false or, alternatively, were reckless as to whether the representations were false.

266 Defendants made these false representations with the intention of misleading BoA current and prospective shareholders into relying on Defendants' false representations.

267. Plaintiffs justifiably relied upon Defendants' false misrepresentations.

268. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered

84

damages.

## COUNT VII
## FRAUD
### (All Defendants)

269.    Plaintiffs incorporates the foregoing paragraphs as though set forth fully herein.

270.    As set forth above, Defendants made multiple false representations of fact, which

Defendants knew were false.

271.    Defendants made false statements for the purpose of inducing BoA shareholders and

prospective shareholders to rely on Defendants' false statements.

272.    Plaintiffs reasonably relied upon Defendants false representations.

273.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered

damages.

85

**WHEREFORE,** Plaintiffs respectfully request that judgment be entered in Plaintiffs' favor against all named Defendants for an amount equal to Plaintiffs' consequential damages; plus pre-judgment interest; plus costs and attorneys fees incurred in prosecuting this claim; and for such other and further relief as this Court deems just and proper.

Respectfully submitted,

ALAN L. FRANK, ESQUIRE
ALAN L. FRANK LAW ASSOCIATES, P.C.
135 Old York Road
Jenkintown, PA 19046
(215)-935-1000
(215)-935-1110 (fax)
afrank@alflaw.net

Dated: September 7, 2012

## 12-MEMBER JURY TRIAL DEMAND

A 12-member jury trial is hereby demanded.

ALAN L. FRANK, ESQUIRE
ALAN L. FRANK LAW ASSOCIATES, P.C.
135 Old York Road
Jenkintown, PA 19046
(215)-935-1000
(215)-935-1110 (fax)
afrank@alflaw.net

Dated: September 7, 2012